# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 2, 2016 Session

## STATE OF TENNESSEE v. JAMES HAWKINS

**Automatic appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 0806057          Chris Craft, Judge**
_____

**No. W2012-00412-SC-DDT-DD – Filed May 1, 2017**
_____


A jury convicted the defendant of the premeditated first degree murder of his girlfriend, who was the mother of his three children. Tenn. Code Ann. § 39-13-202(a)(1) (2014). The jury also found the defendant guilty of initiating a false report concerning her disappearance and of abuse of her corpse, based on his sawing off her head, hands, and feet and throwing the remainder of her body over a bridge in Mississippi. See Tenn. Code Ann. § 39-16-502 (2014); id. § 39-17-312(a). At the conclusion of a separate sentencing hearing on the first degree murder conviction, the jury imposed the death sentence, finding that the prosecution had proven two statutory aggravating circumstances beyond a reasonable doubt, id. § 39-13-204(i)(2), (13), and had established that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, id. § 39-13-204(g). For the remaining convictions, the trial court imposed consecutive sentences of twelve and six years, respectively, and ordered these sentences served consecutively to the death penalty. The defendant appealed, raising numerous issues, and the Court of Criminal Appeals affirmed his convictions and sentences. State v. Hawkins, W2012-00412-CCA-R3-DD, 2015 WL 5169157 (Tenn. Crim. App. Aug. 28, 2015). The case was thereafter automatically docketed in this Court for review, as required by statute, Tenn. Code Ann. § 39-13-206(a)(1), (c)(1). We hold that: (1) the defendant's sentence of death was not imposed in an arbitrary fashion; (2) the evidence supports the jury's findings that the aggravating circumstances were proven beyond a reasonable doubt and that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt; and (3) the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. We also hold that: (1) admission of the defendant's statements was harmless beyond a reasonable doubt; (2) the trial court did not abuse its discretion by refusing to allow the defendant to enter guilty pleas to the noncapital offenses pursuant to Tennessee Rule of Criminal Procedure 11(b) at the beginning of trial, after the jury had been sworn; (3) the trial court did not err by

admitting testimony about the victim's threats to call the police about the defendant's conduct as this testimony was non-hearsay; (4) the trial court did not err by admitting the victim's application for an order of protection against the defendant, pursuant to the forfeiture by wrongdoing exception to the hearsay rule; (5) the trial court did not violate Tennessee Rule of Evidence 404(b) by permitting the defendant's children to testify about his acts of violence and sexual abuse because this testimony was offered to prove motive and premeditation; and (6) any error in the prosecutorial rebuttal argument was not so improper or inflammatory as to prejudice the defendant. Accordingly, we affirm the judgments of the Court of Criminal Appeals and the trial court upholding the defendant's convictions and sentences. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals and include relevant portions of the intermediate appellate court's decision in the appendix to this opinion.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and HOLLY KIRBY, and ROGER A. PAGE, JJ., joined. SHARON G. LEE, J., filed a concurring opinion.

Steven C. Bush, District Public Defender; Phyllis Aluko and Barry Kuhn, Assistant Public Defenders (on appeal); Gerald D. Skahan, Larry Nance, and Kindle Nance, Assistant Public Defenders (at trial), for the appellant, James Hawkins.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Blumstein, Solicitor General; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Patience Branham, Marianne Bell, Jennifer Nichols, and Danielle McCollum, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

#### *A. Guilt-Innocence Phase of Trial*

On September 11, 2008, the Shelby County Grand Jury indicted the defendant, James Hawkins, for the premeditated first degree murder of Charlene Gaither, his girlfriend and the mother of his three children. The indictment also charged him with initiating a false report relative to her disappearance and with abuse of her corpse. The State filed a notice of intent to seek the death penalty as to the first degree murder charge, relying upon two aggravating circumstances: (1) "[t]he defendant was previously

convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person"; and (2) "[t]he defendant knowingly mutilated the body of the victim after death." Tenn. Code Ann. § 39-13-204(i)(2), (13) (2014).[1]

The defendant moved pretrial to suppress a statement he gave to the police on February 16, 2008. The proof offered at the pre-trial suppression hearing and during the guilt-innocence phase of the defendant's trial[2] established that the defendant, thirty years of age, and the victim, twenty-eight years of age, had dated sporadically since high school and had three children together—a twelve-year-old daughter, K.T., an eleven-year-old son, J.W.I, and a nine-year-old son, J.S.I.[3] The defendant had been absent from the victim's and the children's lives since 1999 or 2000 until September 2007, when he and the victim began communicating again by telephone. At that time, the victim resided in Covington, Tennessee—forty miles from Memphis—with her husband of four years, Melvin Gaither. She worked full time at the Tipton County Adult Developmental Center, where she earned a reputation as an "extraordinary" person who was "inspiring to other people" and "a wonderful, wonderful co-worker and employee." The victim also had a good relationship with her father, Louis Irvin, Jr., and talked often with him before the defendant returned to her life.

However, on October 18, 2007, the victim and the children abruptly moved from their Covington home into an apartment with the defendant, located at 3461 Wingood Circle in Memphis. Afterwards, near Thanksgiving 2007, the victim failed to show up for work at the Tipton County Adult Developmental Center and never returned.

---

[1] Statutory citations in this opinion are to the statutes currently in effect, unless the statutory language has changed since the commission of the offenses.

[2] While this appeal was pending before the Court of Criminal Appeals, the defendant filed a petition for writ of error coram nobis in the trial court, alleging that newly discovered evidence warranted reversal of his convictions and death sentence. Consistent with State v. Mixon, 983 S.W.2d 661 (Tenn. 1999), the intermediate appellate court stayed all appellate proceedings pending the trial court's resolution of the defendant's petition for writ of error coram nobis. State v. Hawkins, No. W2012-00412-CCA-R3-DD, 2015 WL 5169157, at *2 (Tenn. Crim. App. Aug. 28, 2015). The trial court denied coram nobis relief, and when the defendant timely appealed from the trial court's ruling, the Court of Criminal Appeals consolidated the defendant's coram nobis appeal with his appeal of the present convictions and sentences. Id. The intermediate appellate court affirmed the trial court's denial of coram nobis relief. Id. at *34. The defendant has not raised any issue in this Court concerning the denial of his coram nobis petition; thus, we need not delve into the proof offered or the rulings made on that petition.

[3] "It is the policy of this Court to identify minors in a way that protects their privacy." State v. Frausto, 463 S.W.3d 469, 474 n.3 (Tenn. 2015).

The victim, the defendant, and the children spent Thanksgiving 2007 at the home of the victim's paternal aunt, and the victim's father was there as well. According to Mr. Irvin, the defendant and K.T. stayed off to themselves and did not "mingle" with the rest of the family. The victim was bothered by the attention the defendant paid K.T. and asked Mr. Irvin, "[S]hould a child be so drawn to [her] father[?]" Mr. Irvin assured his daughter that K.T. was merely responding to the defendant returning to her life after a long absence.

Mr. Irvin had little contact with his daughter after Thanksgiving 2007, but other proof showed that the victim's concerns regarding the defendant's relationship with K.T. rapidly escalated, even as the victim's relationship with the defendant deteriorated. For example, the victim contacted her ex-husband, Melvin Gaither, on Christmas Day 2007, and met him for a movie and dinner. The victim told him that the defendant had been threatening her life, and Mr. Gaither encouraged her to get away from the defendant.

Records introduced from Methodist LeBonheur Children's Hospital showed that K.T. was treated on December 26-27, 2007, after she suffered a miscarriage. K.T., who was ten weeks pregnant at the time of the miscarriage, reported to medical staff that the pregnancy had resulted from her consensual sexual relationship with a school classmate, but she refused to discuss the pregnancy further or provide additional details.

Less than ten days after K.T.'s hospitalization—January 5, 2008—the victim again contacted Melvin Gaither, telling him that she "believe[d] [the defendant] want[ed] to kill [her]." Mr. Gaither again encouraged her to get away from the defendant.

A week later, on January 12, 2008, Officer Nancy Trentham of the Memphis Police Department ("MPD") responded to a call at 3461 Wingood Circle—the apartment the victim shared with the defendant. The victim, who was standing outside the apartment with her two sons, told Officer Trentham that she and her sons were leaving and that she wanted K.T. to leave with them. The victim told Officer Trentham that she believed "something inappropriate was going on" between K.T. and the defendant. Officer Trentham and another officer spoke with the defendant, who was "very cooperative . . . polite . . . [and] calm." Officer Trentham also talked privately with K.T. in another room of the apartment. She described K.T. as "very quiet" and "very soft spoken." After speaking with the victim, the defendant, and K.T., Officer Trentham advised the victim that the police could not remove K.T. from the defendant's custody against her will because no custody arrangement existed between the victim and the defendant. Hearing this, the victim became very upset and repeated her belief that something inappropriate was occurring between K.T. and the defendant. Although Officer Trentham completed a memorandum to the Child Advocacy Center, she did not refer the victim for an order of protection, because she did not observe any signs of abuse—domestic or otherwise.

- 4 -

After speaking with Officer Trentham, the victim and her two sons met Milton Harris, to whom she was married from 1998 until 2002, at a Pizza Hut. According to Mr. Harris the victim was "hysterical" and "very upset" because she had left K.T. with the defendant. However, when Mr. Harris spoke with the victim by phone the next day, K.T. was with her. Several days later, the victim and her three children showed up at FedEx where Mr. Harris worked. Because the victim was "really terrified" and "wanted to leave" the defendant, Mr. Harris gave her the keys to an apartment in Memphis that he still had under lease—Prince Rupert Number Four. He also gave her money to obtain a restraining order against the defendant.

On January 15, 2008, the victim went to Citizens Dispute, a Shelby County government agency that assists citizens with the application process for orders of protection, and obtained assistance completing an application for an order of protection against the defendant. In describing the basis of her request for an order of protection, the victim reported that the defendant had become violent on January 12, 2008, and that he had pulled her hair when she told him that she and the children were leaving. The victim also expressed concern that the defendant had been sleeping in the same bed with K.T., but she noted that both the defendant and K.T. had denied that any sexual abuse was occurring. The victim stated that she wanted the defendant to "just stay away." An ex parte order of protection issued that same day, but it was never served on the defendant, and the case was dismissed before the end of the month.

On January 16, 2008, one day after seeking the order of protection, the victim met again with Mr. Gaither and again told him that the defendant was threatening her and that the children would not leave with her. Mr. Gaither did not hear from nor meet with the victim again.

On February 12, 2008, the defendant called the MPD and reported the victim missing. As a result of the report, MPD Officer Kimberly Houston was dispatched to Prince Rupert Number Four to interview the defendant. When Officer Houston arrived, the defendant and all three children were outside unloading groceries from the trunk of a vehicle, which was later identified as the vehicle the victim drove, although it was registered to Melvin Gaither. After confirming that the defendant had called in the report, Officer Houston suggested they talk inside, so the defendant could continue putting away the groceries. The defendant agreed. As they walked upstairs to the defendant's apartment, Officer Houston noticed mothballs scattered near the entrance. The defendant told her the mothballs were to keep away neighborhood cats. Noticing the door to an adjacent apartment ajar, Officer Houston asked if anyone lived there, and the defendant told her the apartment was vacant.

Upon entering the defendant's apartment, Officer Houston noticed "a strong smell of bleach and a mixture of ammonia . . . so strong that [her] eyes had started to water up." Officer Houston asked why "the smell [was] so strong[,]" and the defendant said "that

one of the kids had dropped a bucket of bleach and he was trying to get the bleach smell out with the ammonia smell." Officer Houston asked the defendant to keep the door open, and she stayed near the door because "the scent was too strong." Regarding the missing person report, the defendant told Officer Houston that the victim had left around 9:00 a.m. about three days earlier, Saturday, February 9, 2008, after he and the victim "had gotten into an altercation." The defendant said that he and the victim "argued all the time" and explained that it was not unusual for the victim to leave after an argument and later return. The defendant said he had become concerned on this occasion because the victim had failed to return home or to answer phone calls, so he decided to report her missing.

The defendant was unable to describe the clothing the victim had been wearing when she left, so he asked K.T if she remembered what her mother had been wearing. Neither K.T. nor her brothers were able to describe the victim's clothing, and ultimately, Officer Houston failed to obtain a description of the victim's clothing because "[o]ne thought she had on one color, one thought . . . another color, so they didn't know." Officer Houston noticed K.T. appearing "real angry" during the interview, so she asked K.T. if she was okay. K.T. replied "yeah" and returned to putting away groceries, "slamming doors and the refrigerator and things" as she did so. K.T. eventually left the kitchen with her brothers. When the defendant could not give Officer Houston a description of the vehicle in which the victim left, he called K.T. back to the kitchen to describe it. K.T. said her mother had left in a "dark vehicle," but she could not remember the make or model of the vehicle or anything else about it. The defendant also could not remember any names or contact information for the victim's family and friends.

The defendant told Officer Houston that he had called and talked with the victim not long after she left on February 9th. According to the defendant, he ended the call because the victim asked him not to call her again. The defendant told Officer Houston that he had tried to reach the victim later on multiple occasions, including earlier that very day, February 12, 2008, but she had not answered any of his calls. The defendant gave Officer Houston the victim's cell phone number, but when she dialed it, she reached a recording advising that the service had been disconnected. Officer Houston thought this was strange, because the defendant had just told her about calling the number earlier that same day and receiving no answer. When Officer Houston asked, the defendant denied disconnecting the victim's cell phone. Officer Houston described the defendant's demeanor as "calm but just confused," explaining that he "couldn't . . . give [her] a straight answer with anything that [she] asked him" and had answered most questions with, "I don't know, I don't remember[,] or you'll have to ask someone else."

After interviewing the defendant, Officer Houston "put out a broadcast" consisting of the victim's name, age, height, weight, and the date she had last been seen. She also prepared a written missing person report, which was not the standard policy. In fact, Officer Houston's supervisor reprimanded her for filing this written report and asked her

why she had done so. Officer Houston told her supervisor that "everything on that scene . . . that day just [had not] seem[ed] right . . . ."

Information soon came to light confirming Officer Houston's suspicions. In particular, on Valentine's Day 2008, just two days after Officer Houston interviewed the defendant, Lance McCallum, an employee with the Mississippi Department of Transportation, discovered a "body with the hands cut off above the wrist, both feet cut off above the ankles, and the head and neck removed." Mr. McCallum, who was repairing holes on the Coldwater River Bridge on Highway 78 West in Mississippi, saw the body on an embankment below the bridge. He could tell from his vantage point on the bridge that the body was a female, because the body was nude and facing upward. Mr. McCallum and his coworkers immediately called 9-1-1 and waited on the bridge for law enforcement authorities, who arrived just minutes later.

One of the officers who responded to the 9-1-1 call, Detective Mike Pate of the DeSoto County Mississippi Sheriff's Department, described the body as having three very deep cuts "to the bone" on the thigh, knee, and mid-shin of the right leg but no stab or gunshot wounds. Based on dirt in the wounds, Detective Pate concluded that the dismembered body had been dropped from the top of the hill and had rolled down the embankment. Mississippi authorities extensively searched the areas in the vicinity of the body but never located any of the severed body parts. The condition of the body prevented Mississippi authorities from initially identifying the victim.

On the evening of February 14, 2008, Lieutenant Toney Armstrong of the MPD[4] received a telephone call from a friend, who was the victim's brother-in-law, alerting him that a female body had been discovered in Mississippi and asking him for advice. Lieutenant Armstrong instructed his friend to contact the Mississippi authorities and agreed to start looking into the case himself the next morning. As promised, on the morning of February 15, 2008, Lieutenant Armstrong met with Mississippi law enforcement authorities concerning the discovery of the body, learned of the defendant's missing person report concerning the victim, and learned that the body matched the victim's description. Mississippi authorities thereafter collected a buccal swab from the victim's mother for purposes of DNA testing and, through this testing, eventually identified the body as that of the victim.

After learning that the body matched the victim's description, Lieutenant Armstrong contacted the defendant and asked the defendant to come to his office on the eleventh floor of the building located at 201 Poplar Street in Memphis, explaining that the police were seeking additional information for their investigation of the victim's disappearance. According to Lieutenant Armstrong, the defendant became "very

---

[4] By the time of trial Lieutenant Armstrong was serving as Director of Police Services for the Memphis Police Department.

defensive" and asked why it was "necessary for [him] to come downtown," which "just rolled [Lieutenant Armstrong's] suspicion because it wasn't behavior that you would think that someone that had a loved one missing would display." Lieutenant Armstrong reiterated that the defendant needed to come downtown, but the defendant responded that he was at work at Nike, would not get off until 3:00 or 4:00 p.m., and would call Lieutenant Armstrong later that day.

After ending the conversation with the defendant, Lieutenant Armstrong met with two MPD investigators—MPD Sergeant Anthony Mullins and MPD Lieutenant Caroline Mason—and informed them of the missing person report the defendant had filed on the victim, the body that had been discovered in Mississippi, and his conversation with the defendant, whom he described as "evasive on the phone." Lieutenant Armstrong instructed Sergeant Mullins and Lieutenant Mason to go to the Nike Warehouse and locate the vehicle the defendant was driving, but if it was not there, to go to the Prince Rupert Number Four apartment complex. Lieutenant Mullins also assigned Sergeant Vivian Murray to serve as case coordinator.

When Sergeant Mullins and Lieutenant Mason notified Lieutenant Armstrong that the defendant's vehicle was not at Nike, he repeated the instruction for them to proceed to the Prince Rupert apartment complex. Afterwards, Lieutenant Armstrong called the defendant a second time and asked if he still intended to come downtown later that day. When the defendant said he could not because he did not have "anyone to watch the kids," Lieutenant Armstrong offered to "arrange for a family member to watch the kids." The defendant "still refused to come."

A short time later, Sergeant Mullins and Lieutenant Mason located the vehicle the defendant was driving parked in front of the Prince Rupert Number Four apartment. They drove around for two or three minutes and parked so they could watch the vehicle, but not long after they had parked, the defendant, followed by an unmarked police vehicle, drove past their location. Sergeant Mullins and Lieutenant Mason followed both vehicles. Sergeant Mullins was about to radio for a marked squad car to meet them and stop the defendant, when the defendant turned around and came back towards them. Sergeant Mullins turned on the blue lights mounted inside his vehicle "so [the defendant] would know it was a police officer." The defendant stopped his vehicle in front of them so that the defendant's and Sergeant Mullins's vehicles were "head to head." Sergeant Mullins and Lieutenant Mason got out of their vehicle, and the defendant did as well. The investigators introduced themselves and asked the defendant for identification to ensure they had "the right person," although they were merely verifying what they knew already because they already had the defendant's photograph. Three children were in the vehicle with the defendant.

Sergeant Mullins described the defendant as very nervous, "visibly shaking," and "looking around side to side." The defendant asked why MPD homicide wanted to speak

with him, and he wanted to talk about the missing person report "right then and there . . . in the middle of the parking lot." Sergeant Mullins told the defendant they could go back to his apartment to talk, and the defendant agreed, saying he did not have a problem with speaking to the officers but was concerned about who would "watch [his] kids." They returned to the apartment, and the defendant sent the children up the landing and into the apartment. Sergeant Mullins called Lieutenant Armstrong and told him that they had located the defendant and that they were all waiting at the apartment for Lieutenant Armstrong to arrive with some of the victim's family members to care for the children.

When they arrived, the defendant was standing outside with "several investigators and uniform officers." Lieutenant Armstrong asked the defendant about the strong odor of bleach emanating from the defendant's apartment, and the defendant explained that he had been "doing some cleaning." According to Lieutenant Armstrong, the defendant seemed "extremely agitated to talk to us, almost to a paranoid state." Sergeant Mullins said the defendant was not "very thrilled" that members of the victim's family had arrived to care for the children "but really couldn't complain much." According to Lieutenant Armstrong, the defendant was "looking around as if he [were] looking for an escape route." Believing the defendant "was going to run," Lieutenant Armstrong instructed the officers "to place him in the backseat of a squad car to prevent that." Sergeant Mullins said the defendant ultimately agreed to accompany them to MPD headquarters to give a statement. Although the defendant was transported in the backseat, Sergeant Mullins did not recall the defendant being handcuffed, but he conceded it was possible. Sergeant Mullins said the defendant was not under arrest and the purpose of the interview was to obtain a formal statement, consisting of as much background information as possible about the victim's disappearance, including details of what she may have said or done before leaving, information about her habits, credit cards, ex-husbands, and family, and whether she had ever disappeared before. According to Sergeant Mullins, the missing person report taken on February 12, 2008 "was not a detailed formal statement." The defendant, Sergeant Mullins, and Lieutenant Mason left the apartment complex around 4:15 p.m. on February 15, 2008. Lieutenant Armstrong remained at the apartment, secured the scene, and obtained a search warrant for the apartment.

MPD officers began executing the first search warrant later that same day, February 15, 2008, after the defendant was transported to the homicide office, but the search extended into the next day after another search warrant issued. On the first day of the search, officers noticed a strong odor of bleach and observed that an eighteen-inch square of carpeting had been removed from the master bedroom flooring. Officers applied Luminol, a chemical that visibly reacts with hemoglobin, and discovered the possible presence of blood on the bed rail in the master bedroom and throughout eighty percent of the hallway bathroom. Officers were unable later to perform DNA testing of these areas because Luminol degrades DNA.

When the defendant arrived at MPD headquarters, he was placed in an interview room, locked from the outside, and questioned about the victim's disappearance. He was not advised of his Miranda rights[5] or handcuffed, but he was not free to leave the room, although he had access to a buzzer that allowed him to inform the officers if he needed to leave the room for bathroom breaks.

The defendant gave a statement around 9:04 p.m. on February 15th, which was largely consistent with the statement he had given Officer Houston. The defendant said that he and the victim had argued on the morning of Saturday, February 9, 2008, because she had suspected him of "cheating," and the victim left after the argument, sometime between 9:00 and 10:00 a.m., and he had no knowledge of her whereabouts thereafter. The defendant told officers that his nine-year-old son, J.S.I., had seen the victim get into a dark colored car "with a light skin woman and some dude." Consistent with his initial statement to Officer Houston, the defendant stated that he had spoken with the victim by telephone the afternoon of the day she left, but he added that the victim had told him to raise the children. According to the defendant, the victim contacted him again on Sunday, February 10th, and reiterated that he should raise the children. The defendant consented to provide a DNA sample via a buccal swab and did so. Afterwards, he told Sergeant Mullins and Lieutenant Mason that he had told them everything he could tell them about the victim's disappearance and was ready to go home. He denied having anything to do with her disappearance and indicated he did not want to talk anymore. The investigators told him they still had more questions and needed clarification and continued to question him, although Sergeant Mullins indicated that they would have taken the defendant home had he adamantly made the request, having had no reason to arrest him.

In any event, during the time the defendant remained in the interview room and after he gave the statement around 9:00 p.m., other MPD officers interviewed the children. Although these interviews were conducted without the defendant's knowledge, other family members of the children were present during these interviews. Officers noted several discrepancies between the children's and the defendant's statements, and as a result, at 3:00 a.m. on February 16, 2008, they obtained an order from a judicial commissioner granting a "48 Hour Detention For Probable Cause." Sergeant Mullins described this "48 hour hold" as an option officers use when they "believe [they] have probable cause that [they] could charge somebody with a crime but [they are] not prepared to do so" and need additional time to "confirm or deny" information obtained in the investigation, which was, in this case, the inconsistencies between the defendant's and the children's statements. The defendant was then booked into the jail on a first degree murder forty-eight-hour hold.

---

[5] Miranda v. Arizona, 384 U.S. 436, 445 (1966).

Later that same day, February 16, 2008, MPD officers searched the defendant's apartment a second time. Using a "blue light" capable of detecting evidence not visible to the human eye, officers discovered evidence of heavy cleaning in the hallway bathroom, which had a bathtub. The master bathroom had only a shower. On the floor of the master bedroom officers found a pair of child's panties on top of dark blue adult pajama bottoms. In the kitchen, officers noticed indentations in the linoleum flooring consistent with marks made from a heavy kitchen appliance once resting there. Officers documented scrape marks across the kitchen floor consistent with a large appliance having been moved through the kitchen. Officers also searched an unlocked vacant apartment adjacent to the defendant's apartment and discovered an unplugged "extremely clean" upright freezer with a "very strong odor of bleach." All of the shelving in the freezer had been pushed to the top. MPD officers also searched area garbage dumpsters but were unable to locate any additional evidence. The children told officers the defendant had purchased and later returned a saw from a nearby Kmart on the day the victim went missing. Officers were able to locate at that same Kmart three Craftsman saws like the one the defendant had purchased and returned, and all three had been purchased and returned. Although the officers were unable to determine which, if any, of the three was the saw the defendant had purchased and returned, they retained one of the saws as evidence to illustrate the type of saw. MPD officers also retrieved video surveillance footage from Kmart showing the defendant and the children at the store on February 9, 2008, the day the victim had gone missing.

After confirming various aspects of the children's statements, some of which were inconsistent with the defendant's statement, MPD officers decided to interview the defendant a second time. To do so, they moved him from the jail to an upper floor of the same building. Because he was detained in the jail on the forty-eight-hour hold, MPD officers advised him of his Miranda rights before the interview began. The defendant refused to sign the rights waiver form, but he "emphatic[ally]" stated that he understood his rights and would agree to give a statement. Officers then confronted him with inconsistencies between his initial statement and the children's statements and questioned him about evidence discovered in his apartment when the search warrant was executed. In particular, the defendant was asked about a missing mattress, a missing deep freezer, and a section of carpet missing from the master bedroom. The defendant denied throwing out the mattress and denied that there was ever a deep freezer in the apartment. He also insisted that the carpet had been missing from the master bedroom floor when he moved into the apartment, two or three weeks after the victim and the children moved there.

Having failed to obtain an incriminating statement, the officers decided to return the defendant to the jail. As they were walking through a public area on the first floor of the building, the defendant remarked to Sergeant Mason, "I didn't do it. . . . I didn't do it, but I may have covered it up." The officers returned the defendant to the homicide office on an upper floor of the building. The defendant declined to speak with them in an

interview room, so they took him to Lieutenant Mason's office and again administered <u>Miranda</u> warnings. The defendant again refused to sign the rights waiver form, but this time, he asked for assurances that he would not be charged with first degree murder. The MPD officers declined to provide these assurances, explaining that the district attorney general would decide on the appropriate charges. The defendant then gave a statement implicating his twelve-year-old daughter, K.T., in the victim's murder.

According to the defendant, he and the children went to a movie on Friday, February 8, 2008, while the victim remained at home. When they returned from the movie, the boys went to bed, but he and K.T. remained in the living room, watching television. At some point, the victim awoke and "fussed" at him for keeping K.T. up late. The victim and K.T. eventually went to bed, but the defendant slept in the living room. When he awoke on Saturday morning, he heard K.T. and the victim arguing in the master bedroom. Entering the master bedroom, the defendant saw K.T. holding a knife. The defendant approached K.T. to stop her, but she stabbed the victim in the neck before he reached her. The defendant said he held the victim for one or two hours until she died. K.T. then implored him, "[D]addy, you [have] got to help me cover this up, I don't want to go to prison for the rest of my life." The defendant decided to protect K.T. by dismembering the victim's body and disposing of it in Mississippi. The defendant said that he and K.T. moved the victim to the hallway bathtub and cut off her hands, head, and feet. He and K.T. later drove to Mississippi and disposed of the victim's body and her severed head, hands, and feet. The defendant began this statement around 11:00 or 11:30 p.m. on February 16, 2008, and afterwards, he agreed to guide the MPD officers to the locations in Mississippi where he had disposed of the victim's dismembered remains.

Officers searched the areas to which the defendant directed them but were unable to locate the victim's severed body parts. The search was called off in the early morning hours of February 17, 2008, due to heavy rain, cold, and darkness. The defendant was checked back into the jail around 10:20 a.m. on February 17, 2008. Searches conducted over the next two days were also unsuccessful, and the victim's dismembered remains were never recovered.

Later on February 17, 2008, around 3:22 p.m., Sergeant Mason interviewed K.T. a second time. K.T. had been interviewed on the evening of February 15th but had not been "forthcoming" with officers at that time. K.T. spoke openly with investigators during her February 17th interview, but she became visibly nervous when the defendant called her cell phone multiple times from jail during the interview. Sergeant Murray, who was interviewing K.T., eventually answered the cellphone and asked who was calling. The male caller responded, "James Hawkins," and stated, "[B]itch, don't talk to my daughter," then ended the call. Sergeant Mason recalled that, although K.T. had seemed nervous when the defendant began calling her from jail, she seemed reassured after learning that the defendant was still jailed. The defendant remained jailed after K.T.

gave her February 17th statement, and he was later formally charged with the victim's murder.

K.T. and her brothers, J.W.I. and J.S.I., testified for the prosecution at trial and were cross-examined about inconsistencies between their testimony and the statements they had given the police prior to trial. J.W.I. and J.S.I. were eleven and nine years old, respectively, when their mother went missing. Both recalled moving to Memphis and living for a short time with their mother, sister, and the defendant. J.W.I. said that "[e]verything was simple and quiet" at first, and J.S.I. agreed that "[i]t was nice." After two or three weeks, the defendant and the victim began arguing a lot about the defendant paying more attention to K.T. than to the boys. According to J.S.I., the victim and the defendant fought violently at times. Both boys remembered the defendant breaking the victim's cell phone on one of these occasions, after she threatened to call the police. J.W.I. recalled that during another argument, the victim woke the children and left the apartment with them. He also recalled leaving the apartment with the victim after another argument, driving to the FedEx parking lot, and waiting for Milton Harris, who brought the victim keys to the Prince Rupert apartment.

J.W.I. described another argument that occurred at the Prince Rupert Number Four apartment. The victim and the defendant were in the master bedroom with the door closed, and J.W.I. heard a noise that sounded like a slap coming from the master bedroom. Immediately thereafter, the victim walked out of the master bedroom, her face red as if it had been slapped. J.S.I. said that he, too, had heard a noise during an argument that sounded like the defendant slapping the victim.

J.S.I. also described how K.T.'s personality changed after the defendant began living with them, explaining that she became routinely disobedient of the victim but would "get beat" for disobeying the defendant. J.S.I. said the defendant told K.T. not to talk to her mother, and he had seen the defendant "tongue kissing" K.T., although he had not told anyone what he had seen because he was scared.

J.W.I. also testified about the defendant's relationship with K.T. J.W.I. recalled that, around Christmas 2007, the defendant told him and J.S.I. to stay in the living room while he and K.T. went to another room. However, J.W.I. left the living room to look for batteries, and as he walked down the hall, he saw "out of the corner of [his] eye" the defendant "on top of [his] sister" on the floor of her bedroom. The defendant saw J.W.I. and scolded and yelled at him for leaving the living room. J.W.I. never discussed what he had seen with anyone until after the victim's murder.

The night before the victim went missing, the boys had gone to a movie with the defendant and K.T, while the victim, who was not feeling well, stayed home. When they returned, J.S.I. heard the defendant and the victim arguing, and he said the arguing

continued throughout much of the night. J.S.I. heard the victim say at least four or five times, "[K.T.]'s my baby."

The next morning, the day the victim went missing, both boys recalled K.T. coming into their bedroom, turning up the volume on their television "as loud as it [could] go," and telling them to stay in the bedroom. They stayed in the room as instructed, but J.S.I. heard the victim yelling and heard the yelling stop abruptly, followed by silence. Looking out the window about that same time, J.S.I. saw a car with dark-tinted windows leaving the parking lot and believed the victim had left in the car because the yelling had stopped. On cross-examination, J.S.I. agreed that he had originally told an MPD officer that he saw the victim leaving in the car, but he clarified that he had not actually seen the victim leave in that car and only thought she had left in it because the arguing and yelling stopped about the same time the car left the parking lot.

Both boys recalled K.T. later returning to their bedroom and turning down the volume of the television, and both recalled the defendant telling them the victim "was gone" and saying she had left during the night. Hearing this, J.W.I. thought "something wasn't right because [the victim] wouldn't just up and leave like that." J.S.I. recalled the defendant telling him to go back to bed and remain there.

In the afternoon of the day the victim went missing, the defendant and the children went to a discount store, where the defendant purchased cleaning supplies, and to Kmart, where the defendant purchased a saw that he returned later the same day. At trial, J.W.I. identified surveillance video from Kmart that officers had retrieved, which showed the defendant purchasing and subsequently returning the saw.

When they returned to the apartment after purchasing the saw, the defendant instructed the boys to sit in the car, explaining that he had to prepare a surprise for them inside. J.W.I. and J.S.I. waited in the car for approximately three hours. J.S.I. went inside the apartment once during this time to use the bathroom. The defendant directed him past the hall bathroom to the master bathroom. As he passed the partially open door of the hall bathroom, however, J.S.I. saw a tennis shoe, but someone inside—J.S.I. assumed it was K.T.—quickly shut the door before he could see anything more. After using the bathroom, J.S.I. left the apartment, with the defendant locking the door behind him, and returned to the car to wait with his brother.

Eventually, the defendant and K.T. came back to the car where the boys were waiting, and they all "drove around to different dumpsters throwing away big black garbage bags." When they returned to the apartment, the children helped the defendant clean the apartment. The defendant and K.T. cleaned the hall bathroom, and the boys cleaned the rest of the apartment. The defendant had J.W.I. and J.S.I. throw the mattress from the master bedroom into the dumpster, telling J.S.I. it had a hole in it. When they

entered the master bedroom, J.W.I. noticed that the carpeting had been cut and recalled that it had not been cut before that day.

At some point after the victim went missing, although the precise timing is not clear from his testimony, J.S.I. saw a red liquid dripping from an upright freezer in the kitchen of the apartment. Believing it was Hawaiian Punch, he asked the defendant if he could have some of it. The defendant told J.S.I. it was not Hawaiian Punch and instructed him not to open the freezer. According to J.S.I., the defendant later instructed him and J.W.I. to move the freezer to the back patio, explaining it no longer worked. J.W.I. remembered the freezer went missing from the apartment and recalled the defendant telling him he had thrown it out because it was broken. J.W.I. did not testify that he and J.S.I. removed it at the defendant's request.

K.T., twelve years old when the victim was murdered, testified that the defendant was absent from her life for a long time before returning in the fall of 2007. She first saw him after his long absence during a visit to her paternal aunt's home. K.T. had spent the night and was asleep in her cousin's room, when the defendant came in and told her to come into the living room and watch television with him. K.T. agreed but fell asleep on the couch. She was awakened by the defendant touching her vagina. When K.T. told him to stop, he refused, put his hand over her mouth, told her to be quiet, and continued touching her, putting his fingers in her vagina. She again told him to stop, but he refused. Later, he threatened to hurt her if she told anyone about his conduct.

K.T. said that, after she and her family moved with the defendant to Memphis, the defendant "constantly" touched her vagina, breasts, and buttocks and also asked her to touch his penis with her hand or mouth. K.T. said this touching occurred "[a]bout every other day," and when she protested or fought back, the defendant forced her to comply by hitting her, punching her in the stomach, putting a knife to her throat, or threatening to kill her.

K.T. recalled going to the hospital by ambulance after suffering a miscarriage around Christmas 2007. The defendant rode in the ambulance with K.T., and he and her mother were present when the doctors told her she had miscarried. K.T. did not tell anyone at the time of the miscarriage about the defendant sexually abusing her because she was scared. At trial, however, K.T. denied having sex with anyone at school and said the pregnancy and miscarriage resulted from the defendant sexually abusing her. K.T. admitted she had not disclosed the sexual abuse during an interview at the Child Advocacy Center after the miscarriage, explaining that the defendant had driven her to the interview and that she had known she would be going home with him afterwards because he still lived with her family.

K.T. acknowledged that the victim had left the defendant and moved the family to the Prince Rupert Number Four apartment, but she explained that the victim soon allowed

the defendant to move back in with the family, and according to K.T., the defendant immediately resumed sexually abusing her. K.T. said she always obeyed the defendant's instructions because he would "get crazy" when angered.

According to K.T., the defendant had asked her a few days before the murder to help him kill the victim. When K.T. refused, the defendant grabbed her shirt, held a knife to her, and threatened to kill her. On the night of February 8, 2008, the defendant and the victim argued about K.T. staying up late watching television with the defendant. When K.T. awoke the next morning, they were still arguing. K.T. walked to the hall bathroom and saw the defendant emerge from the kitchen with a knife and walk toward the master bedroom, concealing the knife. As he entered the room, the victim was still arguing and threatening to call the police. The defendant responded, "[Y]ou're not going to call the police, not going to call anybody." The victim, her back to the defendant, stated, "[W]hatever, James," and lay down on the bed on her side. The defendant then stabbed the victim in the neck and choked her. When he released the victim, her body rolled from the bed onto the floor. K.T. could not move and just "stood in shock."

The defendant told K.T. to help him conceal the crime, but she remained standing where she was, not knowing what to do. The defendant came over to her with the knife, placed it under her cheekbone, and told K.T. he would kill her, too, so she helped him. The defendant told K.T. to go to her brothers' room, turn up the volume on the television, and shut the door. She complied and then returned to the master bedroom and helped the defendant place her mother's body in the freezer that was then located in the kitchen. They carried the victim's body, with the defendant holding the victim's feet and K.T. holding the victim's arms. After placing the victim's body in the freezer, they "put a cord around it so it [would] hold . . . shut . . . so her body wouldn't fall out." They then cleaned the master bedroom, cutting bloodstained areas from the bed and carpeting. Later, the defendant, K.T., and her brothers went to a Family Dollar store, where the defendant purchased cleaning supplies, including bleach. Next they went to Kmart, where the defendant purchased a saw and threw the kitchen knife he had used to kill the victim in the garbage can outside the store.

When they arrived back at the apartment complex, the defendant told K.T.'s brothers to wait in the car. K.T. and the defendant went inside and moved the victim's body from the freezer to the bathtub in the hall bathroom because the master bathroom did not have a bathtub. The defendant continued threatening K.T. during this time, telling her to help him or he would kill her. Having witnessed the defendant kill her mother, K.T. "believed him when he said it." The defendant taped K.T.'s hands behind her back and ordered her to turn away as he sawed off the victim's hands, feet, and head with the saw purchased at Kmart. But he forced K.T. to hold her mother's severed head, wrap her mother's body parts in plastic garbage bags, and place them back in the freezer. He also forced K.T. to help him place the rest of the victim's body back in the freezer. Afterwards, K.T. and the defendant cleaned the bathroom, and her brothers were allowed

back inside the apartment. When they came inside, one of her brothers commented, "it stinks in here," so the defendant instructed the children to help him clean the apartment. When they finished cleaning, they all went back to Kmart, where the defendant returned the saw.

During the ensuing night, the defendant woke K.T. and forced her to help him place the victim's remains in the trunk of the car. The defendant and K.T. then went "[f]or a long drive" to Mississippi and eventually stopped on a bridge. The defendant popped the hood and told K.T. to stand at the front of the car with a cellphone to her ear, feigning car trouble for passersby. She did so until the defendant called for her to help him remove the victim's body from the trunk and put it in the ditch. They had returned to the car and were about to leave when the defendant decided to return to the victim's body and "wipe [it] down." When he returned, they drove back to the apartment. K.T. recalled the defendant disposing of the victim's head, hands, and feet "somewhere else" during this drive, but she could not remember where. K.T. had not called the police at any point during the victim's murder or afterwards because she feared the defendant.

K.T. remembered the defendant calling the police and telling them the victim had "r[u]n off" and had "been gone for a while." K.T. also recalled speaking with the police officer who came to the apartment after the defendant made the report. K.T. did not tell the officer what really happened because she was scared. Fear also prevented her from telling the officers, who came about a week later to investigate the victim's disappearance, what had really happened, and she did not tell the whole truth when she gave her initial statement to the police downtown on February 15, 2008, although parts of the statement were true. K.T. lied because she feared the defendant; however, by the time she gave her second statement on February 17, 2008, she knew the defendant would not be going home with her and would not be able to hurt her anymore, so she told officers the truth in her second statement.

In addition to the children's testimony, the prosecution also called Dr. Qadriyyah Debnam to testify. Dr. Debnam, a Special Agent Forensic Scientist with the Tennessee Bureau of Investigation, had performed DNA and serology analysis on several items of evidence. Dr. Debnam stated that blood found on the carpeting in the trunk of the victim's vehicle, which the defendant had driven after her disappearance, and on one of the trays from the freezer found in the apartment adjacent to the defendant's apartment matched the victim's DNA.

Dr. Steven A. Symes, a forensic anthropologist, testified that cuts to the victim's body were consistent with having been made with a "typical seven and a quarter inch circular saw blade," like the blade of the saw the defendant purchased at Kmart. Dr. Symes opined that three cuts to the victim's upper right leg were "abandoned" because the saw was not capable of cutting through that particularly large section of the victim's

leg.  According to Dr. Symes, the saw was capable of cutting the victim's wrists, ankles, and neck.

The parties also entered into evidence a stipulation regarding the victim's cause of death, agreeing that the victim had died from "stabbing, strangulation or a combination of both."

Following a Momon colloquy, see Momon v. State, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify in his own behalf and presented no other evidence.  The jury convicted the defendant of premeditated first degree murder, initiating a false report, and abuse of a corpse.

## B.  Penalty Phase of the Trial

During the penalty phase of the trial, the State introduced proof to show that the defendant had seventeen prior convictions—seven prior convictions for aggravated assault and ten prior convictions for aggravated robbery.  An employee of a Piggly-Wiggly store described how, on November 12, 1997, the defendant and two other men had robbed the store at gunpoint.  Medical evidence established that the wounds on the victim's body were inflicted after her death.  Family members of the victim testified about the devastating impact the victim's murder had on her family.  All three of the victim's children were in counseling and the victim's elder sister, who had two children of her own, was caring for them.  They lived in a two-bedroom, one-bathroom house, and caring for her own children and the victim's children had been financially difficult for the victim's sister.  The victim's father had experienced frustration, rage, and low self-esteem as a result of the victim's murder.  He, his sister, and his sister's daughter had attended and been involved in church before the victim's murder but had become inconsistent in attendance and uninvolved afterwards.

The defendant presented the testimony of a mitigation specialist and also called his mother as a witness.  The mitigation specialist testified about the defendant's familial history.  The defendant was born in 1977, and on his father's side of the family, he had more than twenty siblings and half siblings, although the defendant's father had lost count of exactly how many children he had.  The defendant's mother had eight children, two boys and six girls, but only four children with the defendant's father.  The defendant's father, James Hawkins, Sr., had refused to cooperate fully with the mitigation investigation, and at the time of the defendant's trial, he was under criminal investigation for allegedly sexually abusing the minor children then living with him.  Five minor children had been recently removed from the defendant's father's home and placed with adult sisters, who also had been sexually abused by the defendant's father.  The defendant's father also allegedly had been physically abusing the minor children living in his home at the time of the defendant's trial by forcing a fifteen-year-old to sleep on the floor and by not feeding the children.  Although the defendant had not been sexually

abused, the mitigation specialist testified that the defendant's father had physically and mentally abused the defendant and his siblings. The defendant's father also had been combative and controlling towards the defendant's mother. On at least one occasion when she was pregnant with the defendant, he had pushed her around and tried to physically abuse her.

In addition to his father's abusive behavior toward him, the defendant had also experienced a great personal tragedy when he was nineteen years old. Chris, the defendant's younger brother, was shot by an assailant and killed at the age of fifteen. The defendant was talking with Chris by telephone when the shooting occurred. The defendant went to the scene of the murder and became very upset after seeing Chris's body. The defendant never obtained or received counseling, and according to his family members, the defendant changed in a negative way thereafter. Some of the defendant's paternal family members blamed the defendant for his brother's murder, but the defendant would not talk about his personal life, saying, "I don't want to go there." Within a year after Chris's murder, however, the defendant had committed a robbery and served time in prison.

The mitigation specialist testified that the defendant had been jailed since his arrest for the victim's murder and had been a model inmate, acting as a mentor to other prisoners, cooperating with prison officials, remaining busy, keeping himself and his jail cell clean, and receiving no write-ups for disciplinary infractions. He had also participated in and obtained certificates for several rehabilitative programs. On the whole, the defendant's jail record was better than most, and a person at the jail had written an email detailing how the defendant had helped with promoting positive attitudes and accepting challenges and how the jail personnel wished they had more inmates like the defendant.

By contrast, the defendant had been a poor student in his childhood, completing only the eighth grade. The records indicated that the defendant tried to succeed but was intellectually slow and was diagnosed with attention deficit disorder with hyperactivity as a twelve-year-old in fourth grade. An I.Q. test showed that the defendant had a full scale I.Q. of 77, which was in the borderline mentally retarded range, according to the mitigation specialist. The mitigation specialist opined that the defendant's life had value to his family.

The defendant's mother, Della Thomas, also testified. She explained that she had never married the defendant's father and that he had not supported her and the children, other than occasionally paying her rent and buying the children clothing. She described the defendant's father as controlling and said he hit her twice while she was pregnant with the defendant. Only rarely did the defendant's father spend quality time with the children. The defendant's mother had only recently discovered that the defendant's father had sexually abused two of his daughters.

The defendant's mother recalled the defendant being too active when he started school, and she said he "couldn't learn," although he tried. She had him tested, and the testing revealed the defendant was "borderline retarded." He was also diagnosed with and prescribed Ritalin for attention deficit disorder. According to the defendant's mother, the murder of her younger son, Chris, upset her family tremendously, particularly the defendant. Chris was murdered outside Ms. Thomas's apartment, and when the defendant arrived at the scene and saw the body, he became angry and upset and was arrested for disturbing the peace. She said he changed after his brother's murder, became "a little violent[,] . . . upset[,] and mood swinging." Although the defendant's mother did not excuse the defendant's involvement in the victim's murder, she asked the jury not to impose the death penalty because she loved him, wanted to visit her son in prison, and wanted him to participate as much as possible with the family from prison. Ms. Thomas also expressed her love for her grandchildren and said that, were the jury to impose the death penalty, it would have a "big" impact on her family.

On cross-examination, the defendant's mother agreed that she had spoken with the defendant by telephone while he was jailed on the forty-eight-hour-hold and that she had known the calls were recorded. During those calls, the defendant's mother had reminded him how she had found him a place to stay and had "begged" him not to go back to the victim's apartment because she knew the defendant and the victim could not get along. The defendant's mother agreed that she had told the defendant his children would be "messed up for the rest of their life" because they had no parents. Ms. Thomas agreed that she had done her best to raise her children in a loving home and to protect them and care for them, even though their father was not involved in their lives. She had not abused them and had provided them with food, clothing, and medical care, and made sure they attended school. She agreed that she had raised the defendant in her home and that the defendant was not necessarily impacted by the fact that his father had more than twenty children because the defendant had never lived with his father.

After the defense rested, the case was submitted to the jury. The jury found that the prosecution had proven two aggravating circumstances beyond a reasonable doubt, Tenn. Code Ann. § 39-13-204(i)(2) (prior violent felony convictions) and (i)(13) (mutilation of the victim's body after death), and had proven that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Accordingly, the jury sentenced the defendant to death for the premeditated murder conviction. Id. § 39-13-204(g). For the remaining convictions, initiating a false report and abuse of a corpse, the trial court held a separate sentencing hearing, imposed sentences of twelve and six years, respectively, and ordered these sentences served consecutively, for an effective sentence of eighteen years. The trial court also ordered these sentences served consecutively to the death penalty.

The defendant appealed. The Court of Criminal Appeals affirmed his convictions and sentences. Hawkins, 2015 WL 5169157, at *1. The case was thereafter

automatically docketed in this Court for review, as required by statute. Id. § 39-13-206(a)(1). This Court subsequently entered an order, pursuant to Tennessee Supreme Court Rule 12.2, identifying five issues for oral argument, in addition to the issues this Court is statutorily mandated to review. Id. § 39-13-206(c)(1).

## II. Analysis

### A. Motion to Suppress

#### 1. Standards of Review

When reviewing a trial court's decision on a motion to suppress, appellate courts uphold the trial court's findings of fact, unless the evidence preponderates against them. State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014) (citing State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing a trial court's ruling on a motion to suppress, an appellate court may consider evidence presented at trial, as well as evidence presented at the suppression hearing. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998); see also State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012).[6] The party prevailing in the trial court on a motion to suppress "is entitled to the strongest legitimate view of the evidence . . . as well as all reasonable and legitimate inferences that may be drawn from [the] evidence." Bell, 429 S.W.3d at 529 (citing State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); Day, 263 S.W.3d at 900; Odom, 928 S.W.2d at 23). We review the application of law to facts de novo and afford no presumption of correctness to a lower court's conclusions of law. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

#### 2. Constitutional Principles

The United States and Tennessee constitutions protect against unreasonable searches and seizures. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

---

[6] However, an appellate court determining whether probable cause existed for issuance of a search warrant "may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." Henning, 975 S.W.2d at 295 (citations omitted).

shall not be violated . . . ." );[7] Tenn. Const. art. I, § 7 ("[T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable *searches and seizures* . . . ." (emphasis added)).[8] These constitutional provisions do not specify when a warrant must be obtained but have been interpreted as generally requiring law enforcement to obtain a warrant before undertaking a search or seizure. See Kentucky v. King, 563 U.S. 452, 459 (2011) (stating that under the Fourth Amendment "a warrant must generally be secured"); State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) ("[A]s a general matter, law enforcement officials cannot conduct a search [or effect a seizure] without having first obtained a valid warrant." (citations omitted)). Indeed, warrantless searches and seizures are presumptively unreasonable, and any evidence discovered as a result of a warrantless search or seizure is subject to suppression by way of the exclusionary rule. State v. McCormick, 494 S.W.3d 673, 679 (Tenn. 2016) (citations omitted); Echols, 382 S.W.3d at 277.

Of course, these constitutional protections are implicated only if a search or seizure actually occurs. McCormick, 494 S.W.3d at 679. A consensual police-citizen encounter does not amount to a seizure and does not implicate the constitutional warrant requirement. Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."); McCormick, 494 S.W.3d at 679 (recognizing that consensual police-citizen encounters do not implicate constitutional protections).

The point at which a consensual encounter becomes a seizure is not susceptible of precise definition. Florida v. Royer, 460 U.S. 491, 506 (1983) (plurality opinion) (recognizing that there is no "litmus-paper test for distinguishing a consensual encounter from a seizure"); State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000) (stating that courts must consider the facts of each case to determine whether a seizure has occurred). A seizure of the person occurs, for purposes of the Fourth Amendment and article I, section 7, when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"[9] Florida v. Bostick, 501

---

[7] The Fourth Amendment applies to the States through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 650 (1961).

[8] "'[A]rticle I, section 7 is identical in intent and purpose with the Fourth Amendment.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)).

[9] This test was derived from Justice Stewart's opinion announcing the judgment of the Court in United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (Stewart, J., opinion announcing the judgment). Only one other justice joined the opinion. Id. Three justices concurred in the judgment, indicated that this was an "extremely close" issue, but did not believe the Court should decide it because

U.S. 429, 437 (1991) (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)); State v. Randolph, 74 S.W.3d 330, 336 (Tenn. 2002) ("[W]hether, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave[.]'" (quoting Daniel, 12 S.W.3d at 425)); see also Kaupp v. Texas, 538 U.S. 626, 629-30 (2003). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave," include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554 (Stewart, J., opinion announcing the judgment); see also Kaupp, 538 U.S. at 630; Chesternut, 486 U.S. at 575; Daniel, 12 S.W.3d at 425-26 (stating that, when determining whether a seizure has occurred, courts should consider "the time, place and purpose of the [police-citizen] encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen").

As the United States Supreme Court has explained,

The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to

---

it had not been sufficiently developed in the courts below and did not comment on Justice Stewart's standard, Mendenhall, 446 U.S. at 559-560 n.1 (Powell, J., concurring in part and concurring in the judgment). The four dissenters in Mendenhall questioned the standard Justice Stewart used but concluded the factual record was not developed enough to apply it because the "seizure" issue had not been contested in the courts below, Mendenhall, 446 U.S. at 566, 568-70 (White, J., dissenting). In a subsequent decision, however, the Supreme Court adopted the standard Justice Stewart announced in Mendenhall. Michigan v. Chesternut, 486 U.S. 567, 573 (1988); see also Kaupp v. Texas, 538 U.S. 626, 629-30 (2003); Florida v. Bostick, 501 U.S. 429, 437 (1991).

The United States Supreme Court later modified the Mendenhall standard by holding that, where no physical restraint is involved, an officer's show of authority, such as yelling, "Stop," does not constitute a seizure if the suspect fails to yield to the show of authority. California v. Hodari D., 499 U.S. 621, 626 (1991). This Court subsequently rejected the holding in Hodari D. for purposes of determining when a police officer's show of authority not involving physical restraint constitutes a seizure under article I, section 7 of the Tennessee Constitution. State v. Randolph, 74 S.W.3d 330, 334-36 (Tenn. 2002); see also State v. Nicholson, 188 S.W.3d 649, 658 (Tenn. 2006) (discussing Hodari D. and Randolph). The facts of this case are distinguishable from those of Hodari D. and Randolph. Here, the defendant yielded to police authority and physically remained in police custody after doing so; thus, Hodari D. has no application to these facts. The Mendenhall standard controls under both the federal and state constitutional provisions.

"leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

Chesternut, 486 U.S. at 573-74 (citations omitted). The test is objective, as well, requiring courts to examine the circumstances from the perspective of a reasonable person, and the subjective motivations and perspectives of police officers are irrelevant when not "conveyed to the person confronted." Chesternut, 486 U.S. at 574, 575 n.7 (citation omitted); Daniel, 12 S.W.3d at 425. Having articulated the governing standards, we turn to the task of applying them in this appeal.

### 3. February 15, 2008: Consensual Encounter or Seizure?

Here, the trial court found that the interaction between the defendant and the police prior to his February 16, 2008 statement amounted to a consensual police-citizen encounter only, not a seizure. The Court of Criminal Appeals disagreed and concluded that the evidence preponderated against the trial court's finding that the defendant voluntarily accompanied investigators to the police station and voluntarily remained there until he gave the statement on February 16th. Hawkins, 2015 WL 5169157, at *14-15. We agree with the Court of Criminal Appeals that the evidence preponderates against the trial court's finding.

The defendant did not testify at the suppression hearing or at trial, so the circumstances of the defendant's interactions with the police were provided through the testimony of MPD officers. Although we need not reiterate the testimony in detail, it shows that Lieutenant Armstrong called the defendant on February 15th and asked him to come to MPD headquarters downtown and talk to the officers investigating the victim's disappearance. The defendant expressed reluctance and said he could not come until his work shift ended.

After this conversation, Lieutenant Armstrong directed two MPD investigators to locate the defendant at his work place or his apartment. When they did not locate the defendant at his work place, Lieutenant Armstrong called him again and asked if he still planned to come to MPD headquarters. The defendant refused, saying he had no one to care for the children, and he continued to refuse even after he was told that arrangements could be made for the victim's family members to care for them. Despite his refusal, Lieutenant Armstrong directed the investigators to go to the defendant's apartment complex and attempt to find the defendant. They did so, located his vehicle, followed him when he started to drive out of the complex, activated their blue lights, and stopped him after he turned around and drove back towards his apartment. The defendant's vehicle and the MPD officers' vehicle were "head-to-head" during this encounter. When the defendant exited his vehicle, the officers introduced themselves and told him he needed to accompany them to MPD headquarters to talk about the case. The defendant asked why going downtown was necessary and offered to speak with them at his

apartment complex, again explaining that he had no one to care for the children. MPD officers would not take no for an answer, however, and told the defendant that members of the victim's family would come and care for the children. Officers waited with the defendant until the caregivers arrived, and during this time, other officers arrived on the scene, including Lieutenant Armstrong, who brought with him members of the victim's family. At some point thereafter, the defendant was placed in the backseat of a marked police car and transported to MPD headquarters around 4:15 p.m.

Once at the police station, the defendant was placed in an interview room, which was locked from the outside, and he remained there for several hours. MPD officers questioned him periodically throughout the evening. The defendant had no visitors and was not at liberty to leave the interview room on his own, although a buzzer inside the interview room enabled him to alert officers "if he needed something." The defendant used the buzzer to request breaks and restroom visits "several times" during the evening. The defendant gave a statement around 9:00 p.m. on February 15th, which was consistent with the statement he had given Officer Houston initially after reporting the victim missing. At some point during this statement, the defendant announced that he was ready to go home. One of the MPD officers responded that the police still had more questions, so the defendant remained in the interview room until the early morning hours of February 16th, when he was booked into the jail on the forty-eight-hour-hold for first degree murder. Around 11:00 or 11:30 p.m. on February 16th, the defendant gave a statement implicating K.T. in the victim's murder and implicating himself for making a false report and abuse of a corpse. By the time he gave this statement, the defendant had been in continuous police custody for more than twenty-four hours and had been questioned multiple times about the victim's disappearance and murder.

We conclude that the time, place, and purpose of the encounter, the presence of multiple officers, the nature of the questioning, the actual restraint on the defendant's liberty, the character of the questioning, which focused on the victim's homicide, and the remaining totality of the circumstances certainly would have "communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Chesternut, 486 U.S. at 569; Daniel, 12 S.W.3d at 425. As did the Court of Criminal Appeals, we conclude that the evidence preponderates against the trial court's finding that the encounter was consensual and instead establishes that the defendant had been seized without a warrant, for purposes of the Fourth Amendment and article I, section 7, when he gave the statement on February 16th. Indeed, nothing about the defendant's encounter with the police resembles a consensual encounter between a citizen and the police.

Like every warrantless seizure, the defendant's warrantless seizure was presumptively unreasonable. Of course, this presumption of unreasonableness may be overcome by the State demonstrating by a preponderance of the evidence that the warrantless seizure was conducted pursuant to an exception to the warrant requirement.

King, 563 U.S. at 459-60; Bell, 429 S.W.3d at 529; Meeks, 262 S.W.3d at 722. But here the State has failed to do so. Indeed, although an arrest based on probable cause is an exception to the warrant requirement, Echols, 382 S.W.3d at 277 (citing State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009)), the State has not argued that the police had probable cause to support the warrantless seizure of the defendant.

The Court of Criminal Appeals declined to suppress the defendant's February 16th statement, applying the attenuation doctrine and concluding that the statement was "'sufficiently an act of free will to purge the primary taint'" of his illegal seizure. Hawkins, 2015 WL 5169157, at *14-15 (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963) (relying on Brown v. Illinois, 422 U.S. 590, 598 (1975)).[10] The defendant argues that the intermediate appellate court erred by applying the attenuation doctrine and upholding the admission of his statement, while the State defends the Court of Criminal Appeals' ruling. We need not determine whether the Court of Criminal Appeals erred in applying the attenuation doctrine. We conclude that, even assuming the attenuation doctrine should not have been applied, admission of the defendant's statement was harmless error beyond a reasonable doubt.[11]

### 4. *Harmless Error Analysis*

"In conducting harmless error analysis, this Court has identified three categories of error: (1) structural constitutional error; (2) non-structural constitutional error; and (3) non-constitutional error." Climer, 400 S.W.3d at 569 (citing State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)). "Structural constitutional errors involve 'defects in the trial mechanism' that 'compromise the integrity of the judicial process itself,'" id. (citing Rodriquez, 254 S.W.3d at 371), and as a result, defy harmless error analysis and require automatic reversal, Momon, 18 S.W.3d at 165 (quoting Arizona v. Fulminante, 499 U.S. 279, 309 (1991)).

Non-structural constitutional errors do not require automatic reversal. Rodriguez, 254 S.W.3d at 371. The erroneous admission of evidence obtained in violation of a

---

[10] The attenuation doctrine is an exception to the federal and state exclusionary rules. Utah v. Strieff, __ U.S. __, ___, 136 S. Ct. 2056, 2061 (2016); State v. Huddleston, 924 S.W.2d 666, 674-75 (Tenn. 1996); see also State v. Reynolds, 504 S.W.3d 283, 313 (Tenn. 2016); State v. Carter, 16 S.W.3d 762, 766 (Tenn. 2000).

[11] Because we conclude that the erroneous admission of the defendant's statement is harmless beyond a reasonable doubt, we also need not address the defendant's argument that the statement resulted from his illegal detention, which resulted from the MPD's policy of obtaining a forty-eight-hour hold. Nevertheless, we take this opportunity to reiterate our earlier admonition that making arrests without probable cause and using this forty-eight-hour hold policy to gather additional evidence to justify the arrest would be unconstitutional and should be immediately discontinued. State v. Bishop, 431 S.W.3d 22, 44 n.9 (Tenn. 2014). The use of the forty-eight-hour hold policy in this case predated our admonition in Bishop.

defendant's rights under the Fourth Amendment and article I, section 7 is a non-structural constitutional error, subject to harmless error analysis. State v. Hutchison, 482 S.W.3d 893, 921 (Tenn. 2016). Reversal may be avoided if the State demonstrates "beyond a reasonable doubt that the [non-structural constitutional] error complained of did not contribute to the verdict obtained." Rodriguez, 254 S.W.3d at 371 (internal quotation marks and citations omitted); see also Neder v. United States, 527 U.S. 1, 15 (1999); Chapman v. California, 386 U.S. 18, 24 (1967).

Thus, an appellate court's task when evaluating the effect of a non-structural constitutional error is to ascertain the actual basis for the jury's verdict. Rodriguez, 254 S.W.3d at 372 (citing State v. Mallard, 40 S.W.3d 473, 489 (Tenn. 2001); Momon, 18 S.W.3d at 168). This task requires more than evaluating the sufficiency of the evidence to support the conviction, and it does not turn on the appellate court's belief about the correctness of the jury's verdict. Rodriguez, 254 S.W.3d at 372. Rather, the task requires an appellate court to focus on the impact the error may reasonably be taken to have had on the jury's decision-making. Id.

We conclude that, even if erroneous, admission of the defendant's statement had minimal impact on the jury's decision-making in this case. Ordinarily a defendant's statement is crucially important evidence to the jury's decision making process. Climer, 400 S.W.3d at 570. This case is an exception to the general rule. Here, the statement the defendant gave after his illegal seizure was one small and relatively insignificant part of the overwhelming proof the prosecution offered to convince the jury of the defendant's guilt. The prosecution presented evidence that the victim planned to report the defendant for sexually abusing his own daughter, that the victim feared the defendant and feared he would harm her if she reported his conduct toward K.T., and that the defendant reported the victim missing under suspicious circumstances. The defendant's children testified against him and described his actions on the day the victim went missing. The boys' testimony implicated the defendant circumstantially in the victim's murder, while K.T. testified as an eyewitness to the defendant murdering the victim. She also gave a detailed statement of how the murder and subsequent concealment, abuse, and disposal of the victim's corpse occurred. The prosecution offered physical proof and expert proof to corroborate K.T.'s testimony and that of her brothers.

Additionally, in the statement at issue, the defendant denied murdering the victim and admitted only his part in dismembering and disposing of her corpse. At the beginning of trial, he entered a guilty plea to the crimes he confessed to committing in his statement—initiating a false report and abuse of a corpse. Admission of the statement was cumulative of the admission the defendant made in the presence of the jury. Having carefully considered the entire record on appeal, we conclude that the State has demonstrated beyond a reasonable doubt that the erroneous admission of the defendant's statement did not affect the jury's verdict and was harmless beyond a reasonable doubt.

## B. Defendant's Attempt to Enter Guilty Pleas

The defendant next contends that the trial court abused its discretion by declining to "consider" his guilty pleas to two counts of the indictment. The State responds that the trial court did not abuse its discretion. The record reflects that, after the jury was empaneled and sworn, the indictment was read in the presence of the jury. The trial judge next asked the defendant how he wished to plead, and without prior consultation with the trial judge, defense counsel announced that the defendant wished to plead guilty to initiating a false report and abuse of a corpse, counts two and three of the indictment. Defense counsel then immediately approached the bench and asked the trial court to exclude evidence of those offenses from trial, arguing that, as a result of the defendant's guilty pleas, the offenses amounted to prior bad acts for purposes of Rule 404(b) of the Tennessee Rules of Evidence. When the trial court denied this request, defense counsel then asked the trial judge to accept the defendant's guilty pleas pursuant to Rule 11(b) of the Tennessee Rules of Criminal Procedure.[12] The trial judge explained that, were he to accept the pleas pursuant to Rule 11(b), he would be required to determine whether the pleas were made knowingly and voluntarily and to do this would need to explain to the defendant that evidence of the charges would be admissible despite the pleas. Because this could involve delving into and potentially disclosing defense strategy on the record, the trial court declined to accept the pleas pursuant to Rule 11(b). Moreover, the trial judge commented, correctly and consistently with Rule 11(c)(2)(B),[13] that the defendant's wish to enter guilty pleas under Rule 11 should have been disclosed before the jury was sworn and "probably could have been done . . . a couple of weeks" before trial.

In his motion for new trial, the defendant argued that, by refusing to accept his guilty pleas, the trial court had violated the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 8 and 9 of the Tennessee Constitution. The trial court rejected this argument, explaining:

> Now, as far as getting in a situation where the jury does not consider that, at the time he pled guilty in front of the jury, he had not signed any waivers, he had not—I had not been allowed to cross-examine him or voir dire him on Rule 11[,] and I had nothing on which to base his freely and voluntarily

---

[12] As pertinent to this appeal, Rule 11(b)(1) states that, "[b]efore accepting a guilty . . . plea, the court *shall* address the defendant personally in open court and inform the defendant of, and determine that he . . . understands" several different categories of information. Tenn. R. Crim. P. 11(b)(1) (emphasis added).

[13] Tenn. R. Crim. P. 11(c)(2)(B) ("Except for good cause shown, the parties shall notify the court of a plea agreement at the arraignment or at such other time *before trial* as the court orders." (emphasis added)).

- 28 -

given plea.  And so for that reason, he has a right to choose to plead guilty in front of the jury, but if the jury had not found him guilty of those offenses, they could have found him not guilty.  They did not have to accept the plea that he entered[,] and I think it would have been improper for me to remove those counts without properly exercising what I'm mandated to do under Rule 11.

I also would have—I also found, I think when I talk about that, that any proof of the abuse of the corpse would also come in to show the circumstances of the crime, and for that reason I didn't see that there was a good reason for him to plead guilty other than to let the jury know that he's admitting that he did that, which would somehow be mitigating.  But I don't know of any legal authority that says that once I hear a defendant's plea in front of a jury then I'm obligated to stop and then try to sever those out and then go and reset the case to try to pick another jury.  So he has a right to plead guilty in front of the jury[,] and I don't have any legal obligation to accept the plea when the defendant has not been voir dired or signed a written waiver, so I feel that ruling was proper.

The defendant challenged the trial court's decision in the Court of Criminal Appeals, again arguing that the trial court's refusal to accept his pleas prevented him from excluding proof of those offenses under Rule 404(b) of the Tennessee Rules of Evidence, which, in turn, deprived him of Due Process and interfered with his right to present a defense.  The intermediate appellate court disagreed and concluded that the trial court had not abused its discretion by refusing to accept the pleas.  Hawkins, 2015 WL 5169157, at *17.  We agree.

It first must be emphasized that Rule 11(b) of the Tennessee Rules of Criminal Procedure governs the process that applies to guilty pleas that result from plea bargaining.  It does not prescribe a process for trial courts to follow when a defendant waits until a jury has been sworn and trial has begun to announce his intention to plead guilty to some of the charges of the indictment, without notifying the trial court of his intention to do so.  To the contrary, Rule 11(c)(2)(B) indicates that the preferred practice and the ordinary practice requires the parties to advise the trial court of a plea agreement, stating that, "[e]xcept for good cause shown, the parties *shall notify* the court of a plea agreement at the arraignment or at such other time *before trial* as the court orders." (Emphases added).  Had the defendant notified the trial court of his desire to plead guilty before trial, he also could have obtained a pretrial ruling on whether his guilty pleas would have rendered evidence of the offenses to which he wished to plead guilty inadmissible under Tennessee Rule of Evidence 404(b).  But the defendant failed to notify the trial court before trial of his wish to plead guilty, as Rule 11(c)(2)(B) requires, and the trial court cited the tardiness of the attempted guilty pleas when refusing to accept them under Rule 11(b).

Trial judges have "broad discretion" to control the course and conduct of trials. State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994). Moreover, a defendant has "no absolute right to have a guilty plea accepted. A court may reject a plea in exercise of sound judicial discretion." Santobello v. New York, 404 U.S. 257, 262 (1971) (citations omitted) (discussing pleas under Federal Rule of Criminal Procedure 11); see State v. Layman, 214 S.W.3d 442, 452 (Tenn. 2007) ("[A] trial court has discretion under Rule 11 of the Tennessee Rules of Criminal Procedure to reject a plea agreement . . . ."); State v. Todd, 654 S.W.2d 379, 382 (Tenn. 1983) ("The trial judge may accept or reject the plea agreement in the exercise of his discretion.") (discussing Tennessee Rule of Criminal Procedure 11). A trial court's refusal to accept a guilty plea will be reversed on appeal only if the trial court has abused its discretion. Santobello, 404 U.S. at 262 ("A court may reject a plea in exercise of sound judicial discretion."); State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995) (holding that trial court acted within its authority in rejecting a plea bargain in a capital case). "An abuse of discretion occurs when [a] trial court applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). This standard recognizes that a trial court's discretion "'is to be guided by sound legal principles.'" Id. (quoting Martha S. Davis, Standards of Review: Judicial Review of Discretionary Decisionmaking, 2 J. App. Prac. & Process 47, 58 (2000)).

The record before us establishes that the defendant admitted guilt to the offenses to which he attempted to plead guilty as early as February 16, 2008, but waited nearly three years—until after a jury was sworn, jeopardy had attached, witnesses were summoned, and the trial was underway—before asking the trial court to accept guilty pleas to those offenses pursuant to Rule 11(b). Under these circumstances, we cannot say that the trial court abused its discretion by refusing the defendant's request. See State v. Murphy, No. W2011-00744-CCA-R3CD, 2012 WL 1656735, at *4 (Tenn. Crim. App. May 9, 2012) ("Given the wide discretion afforded the trial court to reject a plea agreement and the fact that the defendant has no entitlement to a specific plea agreement, we cannot say that the trial court abused its discretion by rejecting the agreement in this case on the basis of its coming after the plea deadline.").

Moreover, even if we agreed with the defendant that the trial judge abused its discretion by refusing to accept the pleas pursuant to Rule 11(b), the defendant has failed to establish prejudice resulting from this error. As the trial court and Court of Criminal Appeals explained, evidence of the underlying offenses would have remained admissible even if the trial court had accepted the defendant's guilty pleas. Hawkins, 2015 WL 5169157, at *17. Tennessee Rule of Evidence 404(b) excludes evidence of "other crimes, wrongs, or acts" but only if such evidence is offered "to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). One "other purpose" for which this evidence may be admitted is to establish premeditation. See, e.g., State v. Smith, 868

S.W.2d 561, 578 (Tenn. 1993). Evidence showing that the defendant dismembered the victim's corpse and made a false report to the police regarding her disappearance would have been admissible under Rule 404(b) to prove premeditation, an element of the remaining first degree murder charge. See State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005) (stating that the circumstances of the crime, including the destruction or secretion of evidence and calmness after a killing, may support a finding of premeditation); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (same). That the defendant committed these offenses after the victim's murder does not limit their relevance or admissibility on the issue of premeditation. State v. Elkins, 102 S.W.3d 578, 584 (Tenn. 2003) ("Rule 404(b) would permit the introduction of evidence of subsequent acts to establish one's intent during a prior act in appropriate cases."). In the circumstances of this case, the defendant's guilty pleas simply would not have entitled him to prevent the State from offering proof that he dismembered the victim's corpse and made a false report of her disappearance. Cf. State v. West, 767 S.W.2d 387, 394 (Tenn. 1989) (recognizing that "the State is entitled to prove all of the relevant circumstances in such manner as it sees fit, within the rules of evidence" and upholding a trial court's refusal to accept a defendant's stipulation to certain facts which the defendant offered in an effort to preclude the admission of damaging testimony); State v. Morris, 641 S.W.2d 883, 889 (Tenn. 1982) ("Stipulations are a matter of mutual agreement and not a matter of right by one party or the other in an adversary proceeding.").[14] Thus, we conclude that the trial court did not abuse its discretion in refusing to consider the defendant's guilty pleas under Rule 11(b). But, even assuming the trial court erred, the defendant has failed to establish that he was prejudiced by the error. See State v. Walker, No. E2002-03093-CCA-R3-CD, 2003 WL 22258181, at *7 (Tenn. Crim. App. Oct. 2, 2003) (holding that the trial court did not abuse its discretion by refusing to accept the defendant's guilty pleas to two counts of the indictment and stating that even if the trial court erred, the error had not prejudiced the defendant, because "he was found guilty by the jury of the charges to which he intended to plead and the evidence of the other crimes would have been admissible in the trial for the first degree murder charge").

## C. Alleged Evidentiary Errors

The defendant next argues that the trial court erred by admitting the victim's hearsay statements through the testimony of her children and of Melvin Gaither, and through the admission of exhibit sixty-one, the victim's application for an order of protection.

---

[14] The trial court did not prevent the defendant from admitting guilt and accepting responsibility for these offenses at trial. Nor did the trial court restrict or prevent the defense from making arguments to the jury based on the defendant's admission of guilt to those offenses.

A hearsay statement is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, a hearsay statement is not admissible unless it falls within one of the exceptions to the hearsay rule. Tenn. R. Evid. 802. The following standards define our review of the trial court's rulings on the admissibility of hearsay:

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must [next] determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule— are questions of law subject to de novo review.

> If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement. However, the statement may otherwise run afoul of another rule of evidence . . . . If a trial court excludes otherwise admissible hearsay on the basis of Rule 401, 402, or 403, this determination is reviewed for abuse of discretion.

Kendrick v. State, 454 S.W.3d 450, 479-80 (Tenn. 2015) (citations omitted); see also State v. Howard, 504 S.W.3d 260, 275-76 (Tenn. 2016). We now apply these principles to evaluate each of the defendant's challenges to the trial court's evidentiary rulings.

### 1. Admission of the Testimony of the Children

The trial court permitted each of the children to testify about hearing the victim tell the defendant that she was going to call the police, concluding that this testimony was non-hearsay, offered to show the effect the victim's statements had on the defendant, not the truth of the victim's statements that she planned to call the police. The Court of Criminal Appeals affirmed the trial court's decision, Hawkins, 2015 WL 5169157, at *18, and we do as well.

The children's testimony regarding the victim's threats to call the police was offered to establish the effect the victim's statements had on the defendant and to establish the defendant murdered her because *he* believed she planned to call the police.

This testimony was not offered to establish the truth of the victim's threats. As a result, the children's testimony about the victim's statements was properly admitted as non-hearsay. See State v. Venable, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) ("Clearly the statement was probative not as proof of the matter asserted therein, but because of its effect on the hearer, in this case the defendant, supplying evidence of his motive in returning to the service station later in the day, armed and threatening to kill the declarant . . . ."); see generally Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[7] (6th ed. 2011) [hereinafter Tennessee Law of Evidence] (discussing non-hearsay declarations offered to prove the effect on the listener).

## 2. *Testimony of Melvin Gaither*

The trial court also allowed Melvin Gaither to testify about the victim's statements to him concerning her fear of the defendant. The trial court ruled that the victim's statements were hearsay—offered for the truth of the matter asserted therein—but admissible pursuant to the state of mind exception to the hearsay rule. Tenn. R. Evid. 803(3). The Court of Criminal Appeals affirmed, Hawkins, 2015 WL 5169157, at *19, and we agree that this evidence was properly admitted.

> The state of mind exception authorizes the admission of a hearsay statement
>
> of the declarant's then existing state of mind, emotion, sensation, or physical conditions (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tenn. R. Evid. 803(3). Here, the defendant initially told the police that the victim left home in anger following an argument with him. Later, the defendant admitted the victim had been murdered but claimed that K.T had murdered her after K.T. and the victim argued. The defendant maintained that he had not participated in the murder at all and had only assisted K.T. in covering up the crime and dismembering and disposing of the victim's body. The defendant never recanted his statement implicating K.T. and denying his own involvement in the victim's murder. The defendant's statements placed at issue the victim's mental state at the time of her murder. The State was entitled to establish that the victim feared the defendant, not K.T., at the time of her murder. See Smith, 868 S.W.2d at 573 (ruling that the victim's hearsay statements expressing fear of the defendant were admissible under the state of mind exception and relevant "to reveal the falsehood" of the defendant's statement to the police indicating that he and his wife, the victim, were reconciling); State v. Trusty, 326 S.W.3d 582, 603 (Tenn. Crim. App. 2010) ("Given the proof of the on-again, off-again nature of the victim's relationship with the defendant, we conclude that the statements she made shortly before her death about her fear of the defendant were relevant and admissible under the state of mind exception to

show not only her state of mind at the time she uttered the statements, but also her probable mental state and behavior at the time of her death . . . .").  The trial court did not err by admitting Mr. Gaither's testimony about the victim's statements pursuant to the state of mind hearsay exception.

### 3. Application for Order of Protection

The defendant next challenges the trial court's admission of the victim's January 15, 2008 application for an order or protection.  The application was admitted as exhibit sixty-one through the testimony of Deborah Coffman, a counselor and records keeper for Citizens Dispute, a Shelby County government agency that assists persons in completing the application process for orders of protection.  The victim's application included the following statements:

> [The defendant] had the impression that he would be moving with me and my three children[.]  When he realized he was not moving, he became violent pulling my hair and hit me on my right cheek (jaw) with his fist[.]  He was telling my twelve year old daughter to lock herself in the bathroom and to tell the police that I pulled her hair (abused her)[.]  He was not arrested for his violence.
>
> He wants my twelve year old daughter to be around him often, sleep with him and she has changed telling lies and disrespectful, I hope he hasn't molested her, he says no and she says no but both have lied, so I'm just trying to protect me and the children.
>
> I don't want him around me or my children, I don't trust him.

The application also included the victim's statement that the defendant had told her she "was wrong for taking" K.T. from him and that he could "get" the victim "without . . . even having to touch [her]" because he could "get somebody else to get" the victim.

The trial court admitted the application pursuant to the forfeiture by wrongdoing exception to the hearsay rule, explaining:

> And I'm finding, just so we'll all understand, their relationship had deteriorated to such a point, [the victim] and [the defendant], that at this point I think the record—that the State has shown by a preponderance of the evidence from this hearing that the reason for the killing, the motive for the killing, would be to stop her from prosecuting him for things against her and her child because she's here talking about harassing phone calls and

- 34 -

things like that.  So, I think [Tennessee Rule of Evidence] 804(6) is going to apply to this case to that extent.

The Court of Criminal Appeals affirmed the trial court's ruling.  Hawkins, 2015 WL 5169157, at \*19.  We also affirm the trial court's ruling.

The forfeiture by wrongdoing exception authorizes the admission of a hearsay statement "against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness."  Tenn. R. Evid. 804(b)(6).  Before admitting a hearsay statement under this exception, the trial court must conduct a jury-out hearing and determine that "a preponderance of the evidence establishes: 1) that the defendant was involved in or responsible for procuring the unavailability of the declarant; and 2) that [the] defendant's actions were intended, at least in part, to procure the absence of the declarant."  State v. Ivy, 188 S.W.3d 132, 147 (Tenn. 2006); see also State v. Brooks, 249 S.W.3d 323, 325 (Tenn. 2008) (stating that, for the exception to apply, the State must show that the defendant's actions "were intended, at least in part, to prevent a witness from testifying."); Tennessee Law of Evidence, § 8.40[2] (discussing the forfeiture by wrongdoing exception).

In Ivy, this Court upheld the admission of a hearsay statement at the defendant's homicide trial, explaining that the preponderance of the proof established that the defendant murdered the declarant to prevent her from contacting the police about his aggravated assault against her.  Ivy, 188 S.W.3d at 147.  In Brooks, this Court declined to apply the exception to admit the victim's hearsay statement because no proof was offered to show either that the defendant had threatened to harm the victim if she went to the police or that the defendant knew the victim had spoken to the police about him.  Brooks, 249 S.W.3d at 329.

The facts of this case are very similar to Ivy.  The proof offered at the jury-out hearing showed that, even before the victim applied for the order of protection, she had summoned the police to the Prince Rupert apartment and attempted to remove K.T. and deny the defendant access to her.  The application recites the defendant's threats against the victim because she called the police.  Additionally, K.T. testified that, immediately before the defendant murdered the victim, the victim had again threatened to call the police, prompting the defendant to respond, "You're not going to call the police, not going to call anybody," and then to murder the victim.  We conclude that the proof abundantly supports and does not preponderate against the trial court's determination that the State satisfied the requirements necessary for application of the forfeiture by wrongdoing exception.  Accordingly, the trial court did not err by admitting exhibit sixty-one into evidence pursuant to the forfeiture by wrongdoing exception.

## 4. *Evidence Admitted Under Tennessee Rule of Evidence 404(b)*

The defendant next contends that the trial court admitted evidence in violation of Tennessee Rule of Evidence 404(b). In particular, the defendant challenges the admission of the testimony of J.W.I. and J.S.I. about the defendant breaking the victim's cell phone and about the defendant slapping the victim. According to the defendant, the State failed to offer clear and convincing evidence that these acts actually occurred and this evidence was not relevant to establish a motive for the murder and was inadmissible character evidence meant to show that the defendant is a dangerous person. On these same grounds, the defendant challenges in this Court the trial court's decision allowing K.T. to testify about the defendant sexually abusing her.

Tennessee Rule of Evidence 404(b) provides, in relevant part, as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. *It may, however, be admissible for other purposes.* The conditions which must be satisfied before allowing such evidence are: (1) The court upon request must hold a hearing outside the jury's presence; (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (emphasis added). Evidence of other crimes, wrongs, or bad acts, while not admissible to prove conduct conforming to a character trait, is admissible for other purposes, including establishing motive. State v. Leach, 148 S.W.3d 42, 57-58 (Tenn. 2004); State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). When a trial court substantially complies with the procedures specified in Rule 404(b) before admitting the evidence, appellate courts afford great deference to the trial court's decision and will reverse the decision only if the trial court abused its discretion. State v. Dotson, 450 S.W.3d 1, 76-77 (Tenn. 2014); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court substantially complied with the procedures set out in Rule 404(b), determined that the defendant's conduct had been established by clear and convincing evidence, concluded that this testimony was probative of the defendant's motive to kill the victim—concealing and continuing his sexual abuse of K.T.—and ruled that the probative value of this evidence was not outweighed by the danger of its unfair prejudice. Like the Court of Criminal Appeals, Hawkins, 2015 WL 5169157, at *21, we affirm the trial court's decision.

- 36 -

Here, the boys' testimony indicated that the defendant's arguments with and assaultive conduct toward the victim occurred after she threatened to call the police or threatened to remove herself and the children, including K.T., from the home. Additionally, K.T.'s testimony concerning the defendant's sexual abuse was, in the words of the trial court, "very probative" to show the defendant's motive for murdering the victim, who was attempting to deny the defendant access to K.T.

Despite the defendant's arguments to the contrary, the prosecution offered clear and convincing evidence to establish the defendant's sexual abuse of K.T. Not only did K.T. testify about the abuse, K.T.'s brothers testified about observing the defendant "tongue kissing" K.T. and about seeing the defendant on top of K.T. in the floor of her bedroom after he instructed the boys to remain in another room. In arguing that the prosecution failed to offer clear and convincing proof of the defendant's sexual abuse of K.T., the defendant refers only to K.T.'s testimony at the Rule 404(b) hearing, where she stated that the defendant behaved in a "sexual way" toward her, and argues that this statement is unclear. Additionally, the defendant contends that K.T.'s failure to use the word rape "emasculates" her statement and that her testimony failed to link the defendant to her miscarriage. We disagree. K.T. testified clearly at trial about the defendant sexually abusing her and stated that she had become pregnant by him as a result of the abuse. To avoid confusing the jury, the trial court instructed K.T. and the prosecution not to use the word "rape." The trial court's instruction was intended to minimize the negative and prejudicial connotation associated with the word "rape," and the trial court's instruction was beneficial to the defendant. The prosecution offered clear and convincing proof that the sexual abuse occurred, and the trial court did not abuse its discretion by admitting the children's testimony concerning the defendant's conduct toward the victim and K.T. pursuant to Tennessee Rule of Evidence 404(b).

### D. Improper Closing Argument

The defendant next argues that the trial court permitted the prosecutor to make improper rebuttal closing argument without corrective action and that this improper prosecutorial argument deprived him of a fair trial and violated his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and article I, sections 8 and 9 of the Tennessee Constitution. In support of these contentions, the defendant points to four instances of alleged improper prosecutorial argument, including: (1) the prosecutor using the word "rape" on one occasion to describe the defendant's sexual abuse of K.T., despite the trial court's pretrial prohibition against using the term;[15] (2) the prosecutor's description of the defendant, as "He's mean, he is mean"; (3) the prosecutor's use of the saw that was introduced into evidence as a demonstrative aid

---

[15] The prosecutor stated: "Twelve[-]year[-]old K.T. sat there and watched her mother be cut up and then a knife put to her throat[,] and she was threatened to be killed, after she had been raped repeatedly by this man."

multiple times during rebuttal closing argument; and (4) the prosecutor declaring of the defendant, "This man has never shed a tear for [the victim]—never—never." In this Court, the defendant argues that each of these statements was improper and entitle him to relief, whether considered separately or cumulatively. The State concedes that the prosecutor erred by using the term "rape"; nevertheless, the State contends that the error was harmless and asserts that the other prosecutorial arguments the defendant identifies were not improper.

As the State points out, the defendant did not object contemporaneously during closing argument and cited only the first two instances of allegedly improper prosecutorial argument in his motion for new trial. As a result, the trial court addressed only those two grounds when denying the defendant's motion. The trial court explained its decision on the "rape" reference as follows:

> So even though that word was mentioned and I did not want it to be mentioned to start with after I heard the child's testimony, then I don't see that that word mentioned in closing argument had any effect on the trial or the verdict. So at the time I wrote that order and said they couldn't use the word rape, I was assuming at that point that the child was not going to say that it was without consent. I did not know what the child was going to say, so didn't want to get in and tell the jury well you can't consent if you're less than thirteen and start getting in ancillary matters because we're only trying the death case.

> So I find that the fact the prosecutor used the word rape in her final argument does not warrant a new trial for the defendant or a new sentencing hearing. I find that he got a fair trial and sentencing hearing and the fact of using that word in closing argument did not [a]ffect the verdict as to guilt or sentencing.

Regarding the prosecutor saying, "He's mean!" more than once when referring to the defendant, the trial court ruled:

> I carefully listened of course to the arguments of both sides. These were highly charged emotional arguments. I don't find that either side did anything improper or overly prejudicial that took—that would have made this trial unfair to the defendant in the argument.

The trial court had no opportunity to address the third and fourth instances of allegedly improper arguments. However, the Court of Criminal Appeals considered all four instances of allegedly improper argument and affirmed the trial court's decision in all respects. Hawkins, 2015 WL 5169157, at *23-25. We agree with the courts below that the defendant is not entitled to relief on this basis.

- 38 -

Closing arguments serve "to sharpen and to clarify the issues that must be resolved in a criminal case," State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008) (citing Herring v. New York, 422 U.S. 853, 862 (1975)), "by enabling the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." Id. (citing Christian v. State, 555 S.W.2d 863, 866 (Tenn. 1977)). Prosecution and defense counsel in criminal cases "are expected to be zealous advocates," and as a result, should be afforded "great latitude in both the style and the substance of their arguments." Id. at 130-31 (citations omitted). Indeed, closing arguments in criminal cases are the one phase of the trial "where the lawyers are given the greatest leeway in their manner of expression," and as a result, closing arguments can have a "'rough and tumble quality' about them[.]" Id. at 131 (quoting State v. Skakel, 888 A.2d 985, 1060-61 (Conn. 2006)) (citing Wayne R. LaFave et al., Criminal Procedure § 24.7(b), at 456-57 (3d ed. 2007)).

Nevertheless, while permitted to advocate for the interests of the State "with thoroughness and vigor," prosecutors must not lose sight of their duty to seek justice impartially and their obligation "to see to it that the defendant receives a fair trial." Id. (citing State v. White, 114 S.W.3d 469, 477 (Tenn. 2003); Burlison v. State, 501 S.W.2d 801, 806 (Tenn. 1973); Watkins v. State, 203 S.W. 344, 345 (Tenn. 1918)). "Prosecutors 'may strike hard blows, . . . [but they are] not at liberty to strike foul ones.'" Id. (quoting Berger v. United States, 295 U.S. 78, 88, (1935)). As a result, a "prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." Id. (citing State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999); Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)). Within these bounds, "prosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." Id. (citations omitted).

An appellate court should not lightly overturn a criminal conviction "solely on the basis of the prosecutor's closing argument." Banks, 271 S.W.3d at 131 (citing United States v. Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). An improper closing argument constitutes reversible error only if it "is so inflammatory or improper that [it] affected the outcome of the trial to the defendant's prejudice." Id. (citing State v. Thacker, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014).

In determining whether a prosecutor's closing argument crossed the line of propriety and affected the outcome of the trial to the defendant's prejudice, courts focus upon the following five factors:

(1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the

court and the prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

Jackson, 444 S.W.3d at 591 n.50 (citing State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (adopting the five-factor analysis enunciated in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976))).

Although the defendant did not contemporaneously object to any of the alleged instances of improper prosecutorial argument, we will apply plenary review, rather than plain-error review, to the two alleged instances of improper prosecutorial argument raised in the motion for new trial and consider them in light of the foregoing factors. As the State concedes, the prosecutor erred by using the word "rape," because the trial court had, in a pretrial ruling, prohibited the prosecution and prosecution witnesses from using the term. But, while contrary to the trial court's instruction, considered in context, the use of this term was not so inflammatory or improper that it likely affected the outcome of the trial to the defendant's prejudice. Banks, 271 S.W.3d at 131. Moreover, given K.T.'s trial testimony that she did not consent to the defendant's sexual abuse, we cannot fault the trial court for failing to take corrective action to this single mention of the term "rape," when the defendant failed to object contemporaneously or request a curative instruction. Furthermore, it is difficult to conceive of what curative instruction could have been given that would have been consistent with K.T.'s trial testimony and also would have minimized, rather than emphasized, the prosecutor's single use of the term. The evidence of the defendant's guilt of the victim's murder was overwhelming. The record contains no indication that the prosecutor intentionally violated the trial court's order. That the prosecutor used the term only once during the multi-day trial indicates she did not intentionally violate the order. And, as already noted, by the time closing arguments were presented, the term "rape" accurately described the testimony about the defendant's sexual abuse of K.T., despite the trial court's pre-trial ruling. Use of this term certainly did not enhance or combine with any other trial error to prejudice the defendant.

As for the prosecutor's "He's mean!" argument, we conclude, as did the trial court, that it amounts to forceful and colorful language that was not improper in the context of this case. This argument "'did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent.'" State v. Thomas, 158 S.W.3d 361, 414 (Tenn. 2005) (quoting Darden v. Wainwright, 477 U.S. 168, 181-82 (1986)). The proof showed that the defendant sexually abused his daughter from the first night he returned to her life after a long absence, murdered his long-term girlfriend, who was the mother of his children, and forced his daughter, at the point of a knife while threatening to kill her too, to assist him with hiding, dismembering, and disposing of her own mother's body and with cleaning

the apartment and disposing of evidence of the crime. We cannot say that characterizing the defendant as "mean" was improper, inflammatory, or inconsistent with the proof presented at trial. [16]

We review the remaining two instances of allegedly improper closing argument, which the defendant did not cite as error in his motion for new trial, under the plain error doctrine. These errors would warrant reversal "only in exceptional circumstances." Banks, 271 S.W.3d at 132 n.30 (citing United States v. Smith, 508 F.3d 861, 864 (8th Cir. 2007)). "'[F]leeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers.'" Id. (quoting United States v. Mullins, 446 F.3d 750, 758 (8th Cir. 2006)). To establish that these arguments constitute plain error entitling him to relief, the defendant bears the burden of persuading this Court that the following five prerequisites are satisfied:

> "(1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice."

Dotson, 450 S.W.3d at 49 (quoting State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007)). The defendant has failed to carry his burden of persuasion.

The defendant characterizes the prosecutor's comment that he had never shed tears for the victim as "argument of a purported fact that was not in evidence." But, again, given the leeway lawyers are afforded in making closing argument, we conclude that this argument is properly characterized as a comment on the testimony that the defendant "did not seem particularly concerned" and seemed "disinterested" when discussing the victim's disappearance and murder. In short, the record does not establish that a clear and unequivocal rule of law was breached, so the defendant is not entitled to relief via the plain error doctrine based on this argument.

We reach the same conclusion about the prosecutor's allegedly improper use of the saw multiple times during rebuttal closing argument to demonstrate how the defendant dismembered the victim. We are not at all convinced that the benefits of such dramatic demonstrations outweigh the risks of reversal such demonstrations pose. But,

---

[16] We have previously and repeatedly held that "[i]t is improper for the prosecutor to use epithets to characterize a defendant." Thomas, 158 S.W.3d at 414 (citations omitted). We do not retreat from these holdings but simply conclude that the characterization in this case does not constitute an epithet and instead is a strong but fair comment based on the proof.

no clear rule of law was breached by the prosecutor's use of the saw. The evidence established that the saw was the same type the defendant used to dismember the victim's body, so the prosecutor's argument was based on the evidence. And the proof showed that the defendant used the saw multiple times on the victim's body, removing her head, hands, and feet, so the prosecutor's use of the saw more than once was also consistent with the proof. Nevertheless, we reiterate that prosecutors must balance zealous advocacy with their obligations to seek justice and ensure that defendants receive fair trials. We urge prosecutors to err on the side of restraint and temperance when presenting closing arguments. See, e.g., Jackson, 444 S.W.3d at 589; State v. Payne, 791 S.W.2d 10, 20 (Tenn. 1990). Having concluded that no clear rule of law was breached, the defendant is not entitled to plain error relief on this claim.

## E. Mandatory Statutory Review

We next consider: (1) whether the sentence of death "was imposed in any arbitrary fashion"; (2) whether the evidence supports the jury's findings that the prosecution proved the aggravating circumstances beyond a reasonable doubt; (3) whether the evidence supports the jury's determination that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt; and (4) whether the sentence of death "is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1).

### 1. Arbitrary Imposition of the Death Sentence

The defendant submits that Tennessee "has adopted a proportionality review process that fails to insure or even measure the full arbitrariness of the death penalty as historically imposed in our [S]tate." He argues that because this Court "chooses to limit its review only to cases in which the death penalty has been previously imposed, it necessarily misses the opportunity to determine whether the death penalty is improperly sought and imposed based on racial, gender or geographical criteria." He also alleges that this Court "narrowly defines aberration," which results in "glaring examples of harsher sentences imposed based on inappropriate factors," such as racial and geographical disparity.

This Court has repeatedly rejected arguments virtually identical to those the defendant now advances. Indeed, just four years ago, this Court exhaustively re-examined the propriety of including in the pool for comparison only those similar cases in which a capital sentencing hearing is conducted. We upheld this limitation as appropriate, rejecting the argument that it renders Tennessee's capital sentencing scheme arbitrary. State v. Pruitt, 415 S.W.3d 180, 214-17 (Tenn. 2013); see also State v. Godsey, 60 S.W.3d 759, 783-86 (Tenn. 2001); State v. Bland, 958 S.W.2d 651, 665-67 (Tenn. 1997). We reaffirm Pruitt, which expressly reaffirmed the analysis adopted in Bland.

Pruitt, 415 S.W.3d at 215-17. As we reiterated in Pruitt, "prosecutorial discretion creates the dividing line between the pool of cases adopted in Bland and the other suggested pools," and oversight of prosecutorial discretion in the capital case context would be "an inappropriate invasion into the independent prosecutorial function." Id. at 216. We therefore disagree with the defendant that the proportionality review this Court applies results in arbitrary imposition of the death penalty.

We have otherwise comprehensively reviewed the record on appeal and have determined, based on that review, that the defendant received a full and fair trial, conducted in accordance with applicable statutes and procedural rules. Accordingly, we conclude that the defendant's sentence was not imposed in any arbitrary fashion.

### 2. Sufficiency of the Evidence of Aggravating Circumstances

The jury unanimously found two aggravating circumstances beyond a reasonable doubt—(1) "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person" and (2) "[t]he defendant knowingly mutilated the body of the victim after death." Tenn. Code Ann. § 39-13-204(i)(2), (13). The defendant has not contested the applicability of the (i)(13) aggravating circumstance, but he now challenges the sufficiency of the evidence to establish the (i)(2) aggravating circumstance. He argues that his seven prior convictions for aggravated assault did not all necessarily involve the use of violence to the person. He asserts that if these prior aggravated assault convictions are disregarded, the remaining evidence is insufficient to establish the (i)(2) aggravating circumstance. We disagree.

As the Court of Criminal Appeals noted, and as the State reiterates here, prior to the sentencing phase of the trial, the trial court offered to conduct a hearing, pursuant to State v. Sims, 45 S.W.3d 1 (2001), to determine whether the aggravated assault convictions actually involved the use of violence for purposes of the (i)(2) aggravating circumstance. Hawkins, 2015 WL 5169157, at *29. The defendant neither accepted the trial court's offer nor challenged the use of the aggravated assault convictions during the sentencing hearing or in his motion for new trial. The State argues that the defendant's inaction amounted to waiver of the issue. We ordinarily would agree with the State that waiver applies. But, as the defendant points out, this Court is statutorily required to review the sufficiency of the evidence to support each aggravating circumstance. In satisfying this statutory obligation, we will address the issue, despite the defendant's failure to take the steps ordinarily necessary to preserve it. We conclude that any error in admitting the aggravated assault convictions is harmless beyond a reasonable doubt. In addition to the aggravated assault convictions, the State introduced evidence of the defendant's ten prior aggravated robbery convictions. Even excluding the aggravated assault convictions, then, the evidence is abundantly sufficient to support the jury's

finding of the (i)(2) aggravating circumstance.  The error is harmless beyond a reasonable doubt.  State v. McKinney, 74 S.W.3d 291, 305-06 (Tenn. 2002).

### 3. Weighing Aggravating and Mitigating Circumstances

The evidence also supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.  Tenn. Code Ann. § 39-13-206(c)(1)(C).  The trial court instructed the jury on the following mitigating circumstances: (1) the youth of the defendant at the time of the crime; (2) the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment; (3) the love and support expressed by the defendant's family; (4) the impact of the sentence of death and the defendant's execution on his family; (5) the defendant's limited formal education; (6) the evaluation of the defendant's intellectual functioning; (7) the killing of the defendant's brother; (8) the absence of the defendant's father in his life; (9) any dysfunction in the defendant's family; (10) any exposure of the defendant to physical violence and sexual abuse; (11) any residual doubt jurors had concerning the defendant's guilt or intent to commit the victim's murder; and (12) any other mitigating circumstance raised by the evidence produced by either the prosecution or defense in the guilt or sentencing hearing.  The State proved that the defendant had been previously convicted of ten aggravated robbery convictions, and the defendant admitted dismembering the victim's body.  Having thoroughly reviewed the record, we conclude that a rational juror could have concluded that the aggravating circumstances established by the State beyond a reasonable doubt outweighed any mitigating circumstances beyond a reasonable doubt.

### 4. Proportionality Review

We next consider whether the sentence imposed in this case is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.  Tenn. Code Ann. § 39-13-206(c)(1)(D).  A death sentence is disproportionate only if "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed."  Bland, 958 S.W.2d at 665.  A death sentence is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant received a life sentence.  Id.  In conducting proportionality review, we do not function as a "super jury," Godsey, 60 S.W.3d at 782, nor do we assure "that a sentence less than death was never imposed in a case with similar characteristics,"  Bland, 958 S.W.2d at 665.  Instead, our obligation is to "assure that no aberrant death sentence is affirmed."  Id.

- 44 -

No mathematical or scientific formula controls our analysis. Id. at 668. Rather, we utilize "'the precedent-seeking method'" by which "'we compare the case before us with other cases involving similar defendants and similar crimes.'" Dotson, 450 S.W.3d at 81 (quoting State v. Davis, 141 S.W.3d 600, 619-20 (Tenn. 2004)). This method entails a careful and thorough examination of "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved" in the case under review and a comparison of those factors with other similar cases. State v. Stevens, 78 S.W.3d 817, 842 (Tenn. 2002).

In completing these tasks, we consider the following factors, which focus on the nature of the crime:

(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims.

Bland, 958 S.W.2d at 667 (citations omitted).

With respect to the defendant's characteristics, we consider:

(1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim(s); and (8) the defendant's capacity for rehabilitation.

Id. (citation omitted). In conducting this review, "'we select from the pool of cases in which a capital sentencing hearing was actually conducted [and a jury] determin[ed] whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death.'" State v. Holton, 126 S.W.3d 845, 866 (Tenn. 2004) (quoting State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000)).

Applying this analysis, we conclude that the defendant's sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. The proof shows that the defendant committed the premeditated murder of his girlfriend, and the mother of his children, by stabbing and strangling her. By his own admission, the victim did not die immediately. The motivation for the murder was to prevent the victim from reporting him to the police for sexually abusing their daughter. The record contains no

proof of provocation or justification. After murdering the victim, the defendant forced his twelve-year-old daughter to help him conceal the crime and mutilate and dispose of the victim's body and dismembered remains. He required all three children to help him clean the crime scene, although his sons were unwitting participants. The victim's death was devastating to her children and to her entire family, including her sister who was caring for the victim's children at the time of trial despite the financial strain of doing so.

At the time of the murder, the defendant, a thirty-year-old African-American man, was on parole. He had an extensive prior criminal record, including seventeen prior felony convictions. He did not complete high school but was employed at the Nike factory. He had borderline intellectual functioning and a reported I.Q. of 77. He was not married and had been absent from the lives of his three children and the victim for many years until less than six months before the murder.

In mitigation, the defense offered proof showing that the defendant's father had not been involved much in the defendant's life, had been physically and mentally abusive when he was involved, and was under investigation for sexually abusing his own daughters. The defense also offered proof to show how upset the defendant became when his younger brother was murdered while the defendant was speaking with him by telephone and how drastically the defendant's life changed for the negative after this tragedy occurred. Other proof was presented to show that the defendant had been a model prisoner. The defendant's mother expressed love for the defendant, stated that his life had value to his family, and expressed her hope that, if the death penalty were not imposed, the defendant could continue to participate with the family, to the extent possible, while incarcerated.

Considering the record in this case in light of the relevant factors, we conclude that the defendant's death sentence is not excessive or disproportionate to the penalty imposed in similar cases. While no two capital cases and no two defendants are alike, the following cases and defendants share several similarities with this case and this defendant. See, e.g., State v. Willis, 496 S.W.3d 653 (Tenn. 2016); State v. Davidson, 509 S.W.3d 156 (Tenn. 2016); State v. Davidson, 121 S.W.3d 600 (Tenn. 2003); Terry v. State, 46 S.W.3d 147 (Tenn. 2001); State v. Bondurant, 4 S.W.3d 662 (Tenn. 1999).

This case is not identical to any earlier capital case. The premeditated murder of the victim in the presence of her twelve-year-old daughter and the subsequent mutilation of the victim's body, again in the presence of the victim's daughter and with K.T.'s forced participation, makes this murder particularly horrific. Taken as a whole, this case is by no means "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." Bland, 958 S.W.2d at 665. Thus, we conclude that the sentence of death is neither excessive nor disproportionate to the penalties imposed in similar cases.

### III. Conclusion

We have considered the entire record in this case and find that the sentence of death was not imposed in any arbitrary fashion, that the sentence of death is not excessive or disproportionate, that the evidence supports the jury's findings of the statutory aggravating circumstances and the jury's finding that these aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. We have also considered all of the defendant's assignments of error and conclude that none entitles him to relief. As to the issues raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. The defendant's convictions and sentences are affirmed. The sentence of death shall be carried out as provided by law on the 9th day of May, 2018, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE

# IN THE COURT OF CRIMINAL APPEALS AT OF TENNESSEE AT JACKSON
February 3, 2015 Session Heard at Memphis

## STATE OF TENNESSEE v. JAMES HAWKINS

Direct Appeal from the Criminal Court for Shelby County
No. 0806057 Chris Craft, Judge

_____

### No. W2012-00412-CCA-R3-DD - Filed August 28, 2015
_____

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ. joined.

Steven C. Bush, District Public Defender; Phyllis Aluko and Barry Kuhn, AssistantPublic Defenders (on appeal); Gerald Skahan, Larry Nance, and Kindle Nance, Assistant Public Defenders (at trial), for the appellant, James Hawkins.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; Amy P. Weirich, District Attorney General; Patience Branham, Marianne Bell, Jennifer Nichols, and Danielle McCollum, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## ANALYSIS

### *GUILT–INNOCENCE PHASE ISSUES*

*Admission of Photographs of Bone Fragments*

Defendant argues that the trial court erroneously admitted photographs of bone fragments that he claims were gruesome and inflammatory. The State argues that the photographs were in no manner gruesome. The State asserts that they were relevant to

Doctor Symes' testimony concerning the saw used to dismember the victim and that the trial court committed no abuse of discretion by admitting the photographs.

It is within a trial court's discretion to admit photographic evidence at trial, and this court will not reverse the trial court's determination absent an abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). However, before a photograph may be admitted into evidence, the relevance of the photograph must be established, and the probative value of the photograph must outweigh any prejudicial effect. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Doctor Symes testified concerning the manner in which the victim's feet, hands, and neck/head were removed. He utilized the photographs of bone fragments to illustrate and explain that the cuts were consistent with having been made by a standard skill saw blade. The photographs were not gruesome in any way and merely showed the forensic samples examined by Doctor Symes as they were packaged in plastic bags. We conclude that the photographs were relevant to the manner in which Defendant dismembered the victim's body, and we further determine that the admission of the photographs was not outweighed by any prejudicial effect. Accordingly, Defendant is not entitled to relief on this issue.

*Alleged Discovery Violation*

Defendant argues that the trial court should have excluded crime scene photographs of luminol testing that were not provided during discovery. See Tenn. R.Crim. P. 16(a)(1)(F). The State argues that the record does not establish that a discovery violation occurred and that, assuming the photographs were not provided, Defendant cannot establish any prejudice from the alleged discovery violation.

Tennessee Rule of Criminal Procedure 16(a)(1)(F)(iii) provides, in pertinent part:

> Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, . . . if the item is within the state's possession, custody, or control and:
>
> . . .
>
> (iii) the government intends to use the item in its case-in-chief at trial.

Tenn. R. Crim. P. 16(a)(1)(F)(iii). To enforce the rule, Rule 16(d)(2), provides that if there has been noncompliance, the trial court may order the offending party to permit the discovery or inspection, grant a continuance, prohibit the introduction of the evidence not disclosed or enter such other order as the court deems just under the circumstances. "[T]here is no mandatory exclusion that follows a violation." State v. Sherri Mathis, M2009-00123-CCA-R3-CD, 2012 WL 4461767, at *37 (Tenn. Crim. App. Sept. 26,

2012), perm. app. denied (Tenn. Feb. 25, 2013). Indeed, exclusion of the evidence is disfavored.

> [E]vidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated. See Rule 16(d)(2). The exclusionary rule should not be invoked merely to punish either the State or the defendant for the deliberate conduct of counsel in failing to comply with a discovery order. The court's contempt powers should be employed for this purpose. Rules 12 and 16, as well as the other Rules of Criminal Procedure [,] were adopted to promote justice; they should not be employed to frustrate justice by lightly depriving the State or the defendant of competent evidence.

State v. Garland, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981); State v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984); State v. Briley, 619 S.W.2d 149, 152 (Tenn. Crim. App. 1981).

At trial, Defendant objected to the introduction of the photographs during Investigator Garey's testimony concerning his use of luminol to detect blood evidence in the Prince Rupert apartment. The State asserted that the photographs had been provided during discovery but had possibly shown up very dark on the compact disc provided to Defendant. The trial court took the issue under advisement pending Defendant's providing the compact disc of discovery items to the court for review and a determination of whether the items had, in fact, been provided. The trial court admitted the photographs, and the alleged discovery violation was not revisited until the motion for new trial hearing.

At the motion for new trial hearing, Defendant maintained that he never received the photographs and that had he received the photographs, he would have been able to refute Investigator Garey's testimony that luminol testing produced a degradation of DNA material precluding any serology analysis of the Prince Rupert apartment hallway bathroom. The trial court stated

> I remember the one thing that came up was that ya'll said you had received them. The photographs were basically black. They looked like over-exposed photographs that nobody could tell what they were. And when I first saw the one on the screen, I said well, that's just a— there's nothing there, but then there was some faint glow or something like that they testified to.

There is no indication in the record that the trial court ever reviewed the compact disc that was provided to Defendant in discovery.

In our opinion, Defendant failed to establish that a discovery violation occurred relative to the crime scene photographs. Assuming for the sake of argument that the photographs were not provided, we further conclude that Defendant failed to establish any prejudice requiring exclusion of the photographs. Defendant confessed to dismembering the victim's body in the hallway bathroom. Indeed, during closing argument, defense counsel acknowledged "[o]f course there's going to be blood and lumin[o]l in [the apartment]. I'd be shocked if they hadn't found it." Furthermore, Investigator Garey could have testified regarding the luminol testing and the degradation of DNA evidence without the use of the photographs, which were only marginally instructive to show the results of the luminol testing. The overall effect of the photographs is neutral at best. Therefore, Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Defendant argues that the evidence is insufficient to support his conviction for first degree murder because there is insufficient proof of premeditation, other than the uncorroborated testimony of K.T., whom Defendant characterizes as an accomplice. The State argues that K.T. was not an accomplice and that, therefore, the proof is more than sufficient to sustain Defendant's conviction of premeditated first degree murder.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d. 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Id. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011).

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact to be determined by the jury. State v.

Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Premeditation "may be established by proof of the circumstances surrounding the killing." Suttles, 30 S.W.3d at 261. The Tennessee Supreme Court noted that there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.; see Bland, 958 S.W.2d at 660.

Our supreme court recently explained the accomplice corroboration rule as follows

> When the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law. State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013) (citing State v. Little, 402 S.W.3d 202, 211-12 (Tenn. 2013)). This Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." Id. (citing State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); Clapp v. State, 94 Tenn. 186, 30 S.W. 214, 216 (1895)). The test for whether a witness qualifies as an accomplice is "'whether the alleged accomplice could be indicted for the same offense charged against the defendant.'" Id. (quoting Monts v. State, 214 Tenn. 171, 379 S.W.2d 34, 43 (1964)). Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, "corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; *it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.*" State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). Corroborative evidence must lead to the inferences that a crime has been committed and that the defendant is implicated in the crime. *Id.*

State v. Jones, 450 S.W.3d 866, 887-88 (Tenn. 2014) (emphasis in original).

The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978). When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide this issue. State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness is an accomplice. Id.

Under either scenario, the issue of whether the witness's testimony has been sufficiently corroborated becomes a matter entrusted to the jury as the trier of fact. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994).

Notably, Defendant did not request a jury instruction concerning the accomplice corroboration rule. That being said, we agree with the State that K.T. was not an accomplice in this case. The evidence at trial established that twelve-year-old K.T. was victimized and controlled by Defendant in the months leading up to the victim's death. K.T. testified that she saw Defendant obtain a small knife from the kitchen, approach the victim in the bedroom, and slit the victim's throat when the victim threatened to telephone the police. K.T. watched in stunned silence as Defendant held the victim until she died. She stated that Defendant then threatened her life if she did not assist him in disposing of the victim's body. The proof does not establish that K.T. "knowingly, voluntarily, and with common intent with the principal unite[d] in the commission of a crime." Collier, 411 S.W.3d at 894. To the contrary, the evidence at trial established that K.T. was yet another victim of Defendant's control and domination. Furthermore, even if we were to consider K.T. an accomplice, J.W.I. and J.S.I.'s testimonies, as well as the physical evidence collected at the apartment, all corroborate K.T.'s testimony implicating Defendant in the premeditated first degree murder of the victim. Therefore, we conclude that there is sufficient evidence to support Defendant's conviction of first degree murder. Accordingly, Defendant is not entitled to relief as to this issue.

## SENTENCING PHASE ISSUES

### *Discovery of Investigation of James Hawkins, Sr.*

Defendant contends that the trial court erred by failing to require the State to provide discovery related to the State's investigation of James Hawkins, Sr., concerning the sexual abuse of Defendant's sisters. Evoking Brady v. Maryland, Defendant argues that the State's failure to provide the investigative file deprived Defendant of information relevant to mitigation. He claims that evidence in the file could have established Defendant's exposure to abuse and violence as a child. The State counters that Defendant has failed to establish prejudice from the denial of access to the prosecution's investigative file of Defendant's father because Defendant presented ample evidence of his father's alleged sexual abuse of Defendant's sisters.

In Brady v. Maryland, 373 U.S. 83 (1963),the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Tennessee Supreme Court has held that a defendant must show four elements in order to establish a Brady violation by the State:

(1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

(2) that the State suppressed the information;

(3) that the information was favorable to the accused; and

(4) that the information was material.

Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001).

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and *evidence that could be used to impeach the State's witnesses.*" Id. at 55-56 (emphasis added). "Evidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 58 (quoting State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995)). In determining whether a defendant has adequately proven the materiality of favorable evidence suppressed by the State, "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'" Johnson, 38 S.W.3d at 58 (quoting Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998)).

Ms. Stanback, the mitigation specialist, testified concerning Mr. Hawkins' sexual abuse of Defendant's sisters. Likewise, she also testified concerning the pending criminal investigation. Ms. Thomas, Defendant's mother, testified that she had only recently learned of the sexual abuse allegations and that Defendant's father was only involved in a limited fashion during Defendant's childhood. Under these circumstances, we agree that Defendant has failed to establish the materiality of the pending criminal investigation. Accordingly, Defendant is not entitled to relief as to this issue.

*Special Requested Jury Instruction Regarding Presumptive Sentences*

Defendant argues that the trial court should have instructed the jury that "they were to presume that a life sentence, a sentence of life without the possibility of parole, and a death sentence would be carried out in accordance with the laws of the state." The State correctly notes that this issue has been ruled to be without merit. State v. Thomas, 158 S.W.3d 361, 389-90 (Tenn. 2005).

*Constitutional Attacks on the Death Penalty*

Defendant makes myriad constitutional arguments concerning Tennessee's death penalty statute in general, as well as the imposition of the death penalty in this case. Although not raised in this order in Defendant's brief, we will address each one in turn for the sake of clarity and cogency of our discussion.

Defendant argues that Tennessee Code Annotated section 40-23-114, concerning the implementation of a lethal injection protocol, is an unconstitutional delegation of legislative authority to the executive branch by permitting "the department of correction . . . to promulgate necessary rules and regulations to facilitate the implementation" of a death sentence. T.C.A. § 40-23-114(c). The State argues that the legislature has determined a conviction of first degree murder accompanied by aggravating circumstances is punishable by death and that the method of execution shall be lethal injection. Allowing the department of correction to establish a protocol for the implementation of lethal injection does not constitute an unconstitutional delegation of legislative authority. See Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 309–310 (Tenn. 2005) (holding that the department of correction may be tasked with determining protocol without violating substantive or procedural due process).

Defendant argues that Tennessee Code Annotated section 39-13-204(h), the unanimity requirement of the capital sentencing statute, is unconstitutional because it precludes an instruction regarding the effect of a failure to agree on punishment. The State fails to address this argument. In any event, this issue has been held to be without merit. State v. Vann, 976 S.W.2d 93, 118 (Tenn. 1998).

Citing to Apprendi v. New Jersey, 530 U.S. 466, 494 (2000), Defendant argues that the aggravating circumstances sought by the State to support the imposition of the death penalty must be indicted by the grand jury. The State correctly notes that this issue has been ruled to be without merit. Thomas, 158 S.W.3d at 389-90.

Defendant argues that the trial court's use of the pattern instruction concerning victim impact evidence amounted to an unconstitutional intrusion into the province of the jury. The State correctly notes that this issue has been ruled to be without merit. State v. Banks, 271 S.W.3d 90, 171-72 (Tenn. 2008).

Defendant argues that the death sentence is arbitrary and disproportionate. Specific to the application of aggravating circumstances in this case, he contends that the sentence is arbitrary because the trial court failed to determine whether his prior convictions for aggravated assault involved the use of violence as required by State v. Sims, 45 S.W.3d 1 (Tenn. 2001). The State correctly notes that Defendant failed to avail himself of a Sims hearing when offered by the trial court, and thereby waived any objection to the consideration of the aggravated assault convictions as prior violent felonies. In any event, the ten remaining aggravated robbery convictions would render the inclusion of the seven aggravated assault convictions harmless error, if error at all.

Defendant also contends that the death sentence is disproportionate when compared to a broadened pool of first degree murder cases. This challenge to the appellate review of capital cases have also been rejected. State v. Cazes, 875 S.W.2d 253, 270-71 (Tenn. 1994) (rejecting certain arguments concerning proportionality review); State v. Pruitt, 415 S.W.3d 180 (Tenn. 2013) (refusal to broaden the pool of cases considered in proportionality review).

Defendant challenges the constitutionality of the death penalty in that aggravating circumstances (i)(2), (i)(5), (i)(6), and (i)(7) fail to narrow meaningfully the class of eligible offenders. The State correctly notes that Defendant lacks standing to object to the application of circumstances (i)(5), (i)(6), and (i)(7) because they were neither sought nor found his case. As to his challenge to the application of (i)(2), that the aggravating circumstance is overbroad because it has been construed to include as a prior conviction any conviction which occurs prior to the sentencing hearing regardless of whether the offense occurred prior to the first degree murder for which the defendant is being sentenced, this argument must also fail. State v. Nichols, 877 S.W.2d 722, 736 (Tenn. 1994). Furthermore, we note that the prior convictions that were utilized in this case concerned offenses that occurred years before the present offenses and, therefore, fall squarely into that category of prior convictions to which Defendant seeks to limit the application of the circumstance.

Defendant contends that prosecutorial discretion in seeking the death penalty results in the unconstitutional and discriminatory imposition of the death penalty. This argument has been rejected. Banks, 271 S.W.3d at 155-58.

Finally, Defendant contends that the pattern jury instructions create the mistaken belief that jurors must agree unanimously on mitigating circumstances. This challenge to the pattern jury instruction has likewise been rejected. Banks, 271 S.W.3d at 159.

*Sentencing on Related Felonies*

Defendant argues that the trial court's imposition of sentences for the remaining felonies is excessive in both length and manner of service. At the sentencing hearing concerning the false report and abuse of a corpse convictions, the trial court sentenced Defendant as a Career Offender to a total effective sentence of 18 years. The trial court also ordered the sentences to be served consecutively based upon its findings that Defendant was a professional criminal and qualified as a dangerous offender.

First, Defendant argues that the State's notice to seek enhanced punishment was misleading because the notice cited to the code section concerning Career Offender but indicated in the language of the notice that the State sought to sentence Defendant as a Persistent Offender. The State argues that the typographical inconsistency on the notice

to seek enhanced punishment did not render it invalid and, in any event, Defendant stipulated at the penalty phase of the trial the accuracy of his criminal history.

The purpose of the notice requirement is to provide a defendant with "fair notice" that he is "exposed to other than standard sentencing." State v. Adams, 788 S.W.2d 557 (Tenn. 1990). It is intended to facilitate plea-bargaining, to inform decisions to enter a guilty plea, and to assist with decisions regarding trial strategy. When a detail of the required information is omitted or incorrect, the inquiry should be whether the notice was "materially misleading." Id. at 559. The supreme court specifically held that "when the State has substantially complied with Section 40-35-202(a), an *accused has a duty to inquire about an ambiguous or incomplete notice* and must show prejudice to obtain relief. But it is the State's responsibility to assert the appropriate sentencing status in the first instance, and it may not shift these burdens to an accused by filing what is essentially an empty notice." Id. (emphasis added).

The record reflects that Defendant did not challenge the notice to seek enhanced punishment and, in fact, stipulated the accuracy of his prior convictions at the penalty phase of the first degree murder trial. Based upon this stipulation, the trial court sentenced Defendant as a Career Offender. We conclude that the notice to seek enhanced punishment was not materially misleading. Defendant is not entitled to relief on this issue.

Next, Defendant contends that the record does not support the trial court's determination that he is a professional criminal. The State acknowledges that the record does not support the trial court's finding of professional criminal but argues that the record supports the trial court's alternative determinations that Defendant possessed an extensive history of criminal convictions and that he was a dangerous offender, justifying the imposition of consecutive sentences in this case.

Our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations" "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" State v. Pollard, 432 S.W.3d 851, 859-62 (Tenn. 2013). Thus, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103(2) and (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Pollard, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal.")); see also State v. Bise, 380 S.W.3d 682, 705

(Tenn. 2012). The application of an abuse of discretion with a presumption of reasonableness standard of review when considering consecutive sentencing based upon the "dangerous offender" category in T.C.A. § 40–35–115(b)(4) does not eliminate the requirements of State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995) that the "proof must also establish that the terms [of sentencing] imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." Pollard, 432 S.W.3d at 863 (quoting Wilkerson, 905 S.W.2d at 938).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation;
> or
>
> (7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b).

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. Here, the trial court applied factors (1), (2), and (4) that Defendant is a professional criminal who knowingly devoted his life to criminal acts as a major source of his livelihood, an offender whose history of criminal activity is extensive, and a dangerous offender whose behavior indicates little or no regard for human life. Because the trial court provided reasons on the record establishing two of the statutory grounds for consecutive sentencing—extensive criminal history and dangerous offender—we afford the trial court's decision a presumption of reasonableness. Furthermore, the record shows that the trial court followed the principles and purposes of the Sentencing Act, and the record supports the trial court's findings. We conclude that the trial court did not abuse its discretion by ordering Defendant's sentences to run consecutively. Accordingly, Defendant is not entitled to relief on this issue.

*Denial of Petition for Writ of Error Coram Nobis*

On October 30, 2013, while this appeal was pending, Defendant filed a petition for writ of error coram nobis in the trial court alleging that previously undisclosed DNA testing of fetal tissue collected at K.T.'s hospitalization for the December 2007 miscarriage and the State's subsequent indictment of James Hawkins, Sr., for multiple instances of sexual abuse committed against Defendant's sisters warranted coram nobis relief in the form of a new trial. Following a hearing, the trial court denied relief, concluding that the DNA testing result, which was inconclusive as to paternity, would not have resulted in a different judgment had it been presented at trial and that the evidence concerning Defendant's father's history of sexually abusing Defendant's sisters was known and presented at trial as mitigation evidence.

On appeal, Defendant argues that the trial court erred in denying coram nobis relief. The State argues that the DNA evidence was inconclusive as to paternity and, therefore, could not reasonably affect the outcome of the trial; and that the evidence concerning Defendant's father was known and presented at trial and, therefore, does not qualify as newly discovered pursuant to the coram nobis statute.

A writ of error coram nobis is a very limited remedy which allows a petitioner the opportunity to present newly discovered evidence "which may have resulted in a different verdict if heard by the jury at trial." State v. Workman, 41 S.W.3d 100, 103 (Tenn. 2001); see also State v. Mixon, 983 S.W.2d 661 (Tenn. 1999). The remedy is limited "to matters that were not and could not be litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas proceeding." T.C.A. § 40-26-105. Examples of newly discovered evidence include a

victim's recanted testimony or physical evidence which casts doubts on the guilt of the Petitioner. Workman, 41 S.W.3d at 101; State v. Ratliff, 71 S.W.3d 291 (Tenn. Crim. App. 2001); State v. Hart, 911 S.W.2d 371 (Tenn. Crim. App. 1995). The Supreme Court has stated the following concerning the standard to be applied when a trial court reviews a petition for writ of error coram nobis:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007). Whether to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. Id. at 527-28.

The record reflects that the DNA testing neither excluded nor established Defendant's paternity because the testing yielded no evidence of paternal DNA. We agree with the trial court that such inconclusive results, when viewed in light of the testimony presented at trial that K.T. suffered a miscarriage and that Defendant was the person who impregnated her, would not have resulted in a different outcome if presented at trial. See, e.g., Antonio Leonard Sweatt v. State, M2006-00289-CCA-R3-PC (Tenn. Crim. App., at Nashville May 9, 2007), perm. app. denied (Tenn. Sept. 24, 2007) (inconclusive DNA results do not warrant coram nobis relief). As to Defendant's claim concerning his father's subsequent indictment for sexually abusing Defendant's sisters, the evidence presented at trial concerning the sexual abuse supports the trial court's findings that this evidence does not qualify as newly discovered. Therefore, we conclude that the trial court did not abuse its discretion by denying coram nobis relief. Defendant is not entitled to relief as to this issue.

*Cumulative Error*

Defendant argues that the cumulative effect of the alleged errors entitle him to a new trial. Because we conclude any error was harmless beyond a reasonable doubt, we further conclude that Defendant's due process rights were not violated by any cumulative effect of the alleged errors.